UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WITCHES BREW TOURS LLC                         CIVIL ACTION

VERSUS                                          NO. 21-2051

NEW ORLEANS ARCHDIOCESAN                        SECTION M (5)
CEMETERIES, *et al.*

## ORDER & REASONS

Before the Court are two motions. The first is an amended motion for preliminary injunction filed by plaintiff Association of Cemetery Tour Guides and Companies L3C d/b/a New Orleans Association of Cemetery Tour Guides and Companies ("ACTGC").[1] Defendant New Orleans Archdiocesan Cemeteries d/b/a New Orleans Catholic Cemeteries ("NOAC") responds in opposition.[2] ACTGC replies.[3] The second is a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure filed by NOAC.[4] ACTGC responds in opposition.[5] NOAC replies.[6] The Court conducted a hearing on the motions on January 6, 2022.[7] ACTGC filed a post-hearing brief.[8] Having considered the parties' memoranda, the argument and representations made at the hearing, the record, and the applicable law, the Court issues this Order & Reasons.

---

[1] R. Docs. 2; 16.
[2] R. Doc. 18. Co-defendant Cemetery Tours NOLA, LLC ("CTN") adopted the opposition. R. Doc. 22.
[3] R. Doc. 30.
[4] R. Doc. 17. CTN adopted this motion. R. Doc. 22.
[5] R. Doc. 23.
[6] R. Doc. 28. CTN adopted this reply. R. Doc. 32.
[7] R. Doc. 33.
[8] R. Doc. 37.

I.   BACKGROUND

This case concerns two of New Orleans' most storied cemeteries: St. Louis Cemetery Nos. 1 and 2 (individually, "No. 1" or "No. 2"; together, "Nos. 1 and 2").[9] Situated near the French Quarter, these final resting places of "the famous and forgotten" allegedly attract hundreds of thousands of visitors each year.[10] In 2015, NOAC closed No. 1 to all but "owning" families and visitors who were willing to pay a $20.00 fee.[11] Tour companies were also allowed entry conditioned upon payment of either $4,500.00 a year or $40.00 for each tour, with an additional dollar charge for each visitor on the tour, which would be remitted to NOAC.[12] In early 2020, however, due to the COVID-19 pandemic, NOAC closed both Nos. 1 and 2 to all but immediate family members of the interred.[13] As of November 2021, both cemeteries remained closed,[14] but the parties represented at the hearing that No. 1 was now open for tours.

At some point and through some process unknown to this Court, NOAC awarded a contract to CTN[15] to "manage tours in St. Louis Cemetery [No.] 1."[16] Afterwards, an email was circulated indicating that CTN would commence tours under new terms dictated by NOAC, including: (1) all tour narratives and routes must be approved by NOAC; (2) only tour guides from CTN are allowed to conduct tours; (3) local company tour guides may escort tour groups, but may not offer commentary; and (4) prices will be fixed at $25.00 for adults and $18.00 for tour wholesalers.[17]

---

[9] R. Doc. 16-2 at 2-3, 13.
[10] R. Docs. 10 at 2, 9; 16-2 at 13.
[11] R. Doc. 16-2 at 12, 14.
[12] *Id.* at 14.
[13] R. Docs. 10 at 9; 16-2 at 21.
[14] R. Doc. 16-2 at 17. *See also St. Louis Cemetery No. 1*, CEMETERY TOUR NEW ORLEANS, https://cemeterytourneworleans.com (last visited January 25, 2022).
[15] R. Doc. 18 at 1. The Court has virtually no details about this arrangement other than the mere fact that it exists. At the January 6, 2022 hearing, the parties represented, for the first time, that the agreement was made after CTN allegedly won a bid for the contract.
[16] R. Doc. 16-3 at 1.
[17] *Id.* at 1-2. The Court notes that from the complaint and the instant motions, it is unclear whether any of ACTGC's members received this email. Further, it is unclear whether No. 2 will remain closed, will reopen under the same plan in place for No. 1, or will reopen in accordance with some other procedure.

2

No evidence has been provided to the Court that CTN has ever conducted or is currently conducting these "exclusive" tours. Plaintiff ACTGC, an association of New Orleans cemetery tour guides and companies, alleges that its 67 members "stand to be excluded from visiting and providing their services in the public cemeteries Nos. 1 & 2 due to the recently announced business plan of defendants."[18] ACTGC says that "[n]either the general public nor [its] members care if NOAC wants to promote cemetery tour guides who willingly restrict their tours to the topics preferred by NOAC"; rather, ACTGC takes issue with "NOAC's attempt to exclude the general public, including tour guides unwilling to be controlled by NOAC, from public cemeteries" as a result of their alleged plan.[19]

This action was originally filed by now-terminated plaintiff Witches Brew Tours LLC ("WBT"),[20] which moved for a temporary restraining order ("TRO") and a preliminary injunction enjoining the implementation of the business plan of NOAC and CTN (together, "Defendants").[21] The Court denied WBT's motion for a TRO for failure to demonstrate irreparable injury.[22] Thereafter, ACTGC, an entity created only after WBT commenced this action,[23] replaced WBT as the sole plaintiff in the case.[24] ACTGC asserts five theories of liability against Defendants: (1) unlawful price fixing, in violation of 15 U.S.C. § 1;[25] (2) monopolization by means of unlawful market allocation or exclusion of competition, in violation of 15 U.S.C. § 2;[26] (3) unlawful restraint

---

[18] R. Doc. 10 at 2.
[19] R. Doc. 23 at 24.
[20] R. Doc. 1.
[21] R. Doc. 2.
[22] R. Doc. 5 at 3.
[23] R. Doc. 17-1 at 3.
[24] R. Doc. 10.
[25] *Id.* at 4-5.
[26] *Id.* at 5-6. Claims for unlawful market allocation are typically brought under 15 U.S.C. § 1. *See, e.g., United Biologics, LLC v. Allergy & Asthma Network/Mothers of Asthmatics, Inc*, 2019 WL 830967, at *3 (W.D. Tex. Feb. 21, 2019); *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 493 (5th Cir.), *cert. denied*, 142 S. Ct. 712 (2021).

of trade, in violation of La. R.S. 51:122;[27] (4) unfair and unreasonable monopoly, in violation of La. R.S. 51:123;[28] and (5) "unlawful exclusion of the general public from public religious cemeteries," in violation of general Louisiana cemetery law.[29]

## II. PENDING MOTIONS

### A. ACGTC's Motion for Preliminary Injunction

In its motion, ACGTC requests a preliminary injunction enjoining NOAC from "(a) granting CTN exclusive access to Nos. 1 and 2 for cemetery tours, (b) fixing the price of cemetery tours at NOAC cemeteries, (c) dictating the topics discussed during cemetery tours, and (d) continuing to unreasonably exclude the public from its public religious cemeteries."[30] "ACTGC and the general public will likely suffer irreparable injury and damages if NOAC and CTN commence their anticompetitive scheme," ACTGC asserts.[31] It argues that Defendants' exclusion of the nonpaying public and city-licensed tour guides violates 200 years of custom and the public's right to free and reasonable access to public cemeteries.[32] By keeping the cemeteries closed, "[ACGTC] continues to be deprived of access to Nos. 1 and 2 for tours and, therefore, a sizeable portion of [the] business income and livelihood of its licensed tour guides," it says.[33] Accordingly, ACGTC submits that, at this early stage in the litigation, NOAC should revert to its pre-pandemic

---

[27] R. Doc. 10 at 6-7.
[28] *Id.* at 7-8.
[29] *Id.* at 8-9. The Court notes that in ACGTC's most recent supplemental briefing, it clarifies that, should an amended complaint be necessary, it intends to bring a possessory action to replace the fifth cause of action presently listed in the complaint. R. Doc. 37 at 6.
[30] R. Doc. 16-2 at 17. In its complaint, however, ACTGC says it seeks a preliminary injunction prohibiting NOAC from "(a) treating any of its religious cemeteries as privately owned cemeteries and (b) reopening any of its cemeteries to only a single or small group of cemetery tourism industry participants." R. Doc. 10 at 10.
[31] R. Doc. 16-2 at 17.
[32] *Id.* at 1, 17.
[33] *Id.* at 21.

plan of operation, enacted in 2015, wherein all relevant cemeteries were open, with NOAC receiving entry fees from touring companies bringing visitors into the cemeteries.[34]

In opposition, NOAC argues that ACGTC cannot prove the essential elements required for a preliminary injunction.[35] NOAC contends that, assuming ACGTC has standing and that the Sherman Act, as supplemented by the Clayton Act, applies, ACGTC cannot establish that NOAC has enacted an unreasonable restraint upon trade.[36] In addition, it argues that ACGTC's price-fixing and market-allocation claims are not cognizable because (1) the Act contemplates an antitrust scheme between competitors, which NOAC and CTN are not; and (2) ACGTC has failed to define the relevant market.[37] As a result, argues NOAC, the Court does not have subject-matter jurisdiction over either the federal or state-law claims.[38] NOAC argues further that ACGTC fails to establish a likelihood of success on the merits for its state-law claims because its characterizations of No. 1 as public property that confers certain rights to the public and of Louisiana custom are without merit.[39]

In reply, ACGTC reiterates that all of NOAC's cemeteries are public and, as a result, Defendants cannot legally exclude the nonpaying public or city-licensed tour guides.[40] Further, it argues that an injunction would cause no harm to Defendants, would curtail most of the harm to ACGTC's members and the general public, and would allow ACGTC to remit funds to NOAC to help with its cemetery needs, such as preventing vandalism.[41]

---

[34] *Id.* at 17-18.
[35] R. Doc. 18 at 2.
[36] *Id.* at 2.
[37] *Id.* at 3-5.
[38] *Id.* at 5.
[39] *Id.* at 6-8, 11-12.
[40] R. Doc. 30 at 10.
[41] *Id.* at 6, 10.

B. **NOAC's Motion to Dismiss**

In its motion, NOAC argues that ACTGC has no standing to bring this action and, therefore, this Court lacks subject-matter jurisdiction over ACTGC's claims.[42] First, NOAC argues that because ACTGC was not in existence at the time the action was initiated, it cannot have suffered any injury in fact or any invasion of a legally protected interest sufficient to confer standing.[43] Second, NOAC contends that ACTGC has failed to establish federal jurisdiction pursuant to the Sherman Act, as supplemented by the Clayton Act, because ACTGC failed to demonstrate that (1) NOAC's alleged conduct substantially and directly affects interstate commerce; (2) the restraints in place are unreasonable; (3) the cemetery tours constitute the kind of market to which the Sherman Act, as supplemented by the Clayton Act, applies; or (4) NOAC's decisions have had anticompetitive effects harmful to consumers.[44] Accordingly, NOAC concludes that because the Court cannot exercise original jurisdiction over ACTGC's federal claims or supplemental jurisdiction over ACTGC's state-law claims, the suit must be dismissed.[45]

---

[42] R. Doc. 17 at 1.
[43] R. Doc. 17-1 at 2-3. NOAC thus observes that this litigation was brought on November 5, 2021, and ACTGC filed its formation documents with the Louisiana Secretary of State on November 10, 2021. *Id.* at 3 (citing R. Doc. 17-2). So, NOAC raises the issue whether an entity that was created after an action was filed may have standing to sue as the sole plaintiff. This raises an additional issue whether the injuries of ACGTC's members are "fairly traceable." A plaintiff bears the burden of establishing standing as of the time suit was brought. *Carney v. Adams*, 141 S. Ct. 493, 499 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff bears the burden of proving standing), and *Friends of the Earth, Inc.* v. *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000) (standing is assessed "at the time the action commences")). The constitutional requirement of standing is three-pronged: the plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan*, 504 U.S. at 560-61). The same requirements apply to an entity seeking to establish associational standing, which is "derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 609-10 (5th Cir. 2017). It is unclear from the complaint whether the complained-of conduct is the 2020 cemetery closure or the alleged "anticompetitive scheme," and whether any allegedly resulting injury is fairly traceable to Defendants' conduct.
[44] R. Doc. 17-1 at 2, 2-5.
[45] *Id.* at 6.

In opposition, ACTGC argues that it has sufficiently alleged standing.[46] ACTGC has associational standing, it contends, because it has brought this suit on behalf of its 67 members, even though it does not have standing on its own.[47] Further, ACTGC says that NOAC's attack on its statutory (*i.e.*, antitrust) standing is not jurisdictional, but instead an attack under Rule 8 of the Federal Rules of Civil Procedure.[48] It argues that it has asserted "uncontested facts" demonstrating Defendants' violation of antitrust law and, therefore, satisfies the statutory standing requirement.[49] Accordingly, argues ACTGC, the Court should deny NOAC's motion to dismiss or, in the alternative, grant ACTGC leave to amend its complaint to address any identified failings.[50]

In reply, NOAC argues that ACTGC has not established associational standing because it provides no support that an entity created after a complaint was filed and "solely for the purpose of soliciting clients for this litigation" can establish standing as of the time suit was first filed – especially when that entity replaced the sole plaintiff in the action.[51] And further, says NOAC, ACTGC has not established that the Sherman Act, as supplemented by the Clayton Act, applies because ACTGC avoided addressing the issue in its briefing altogether.[52]

### III. LAW & ANALYSIS

#### A. Preliminary Injunction – no irreparable harm shown

A movant seeking a preliminary injunction must establish (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant if the injunction is denied outweighs the potential harm to the non-movant if the injunction is granted; and (4) that

---

[46] R. Doc. 23 at 5-6.
[47] *Id.* at 1, 5. Thus, ACTGC does not purport to have organizational standing to bring this action.
[48] *Id.* at 6.
[49] *Id.* at 6.
[50] *Id.* at 25.
[51] R. Doc. 30 at 2-3 (emphasis omitted).
[52] *Id.* at 3.

granting the injunction will not disserve the public interest. *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018). "A preliminary injunction is an extraordinary remedy which courts grant only if the movant has clearly carried the burden as to all four elements." *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003). A preliminary injunction "may only be awarded upon a clear showing that the [movant] is entitled to such relief," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), and is never awarded as a matter of right but only within the sound discretion of the district court. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Ultimately, granting a preliminary injunction is "the exception rather than the rule." *Miss. Power & Light Co.*, 760 F.2d at 621.

ACGTC has not carried its burden to show irreparable injury because there is simply no evidence of irreparable harm in the record. "An irreparable injury is one that cannot be undone by monetary damages or one for which monetary damages would be especially difficult to calculate." *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) (footnotes and quotation omitted); *see also Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (concluding that there is no irreparable injury where harm is financial and monetary compensation will make plaintiff whole if plaintiff prevailed). Thus, "'[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975)) (alteration in original omitted). A plaintiff, therefore, must allege harm that cannot be obviated by monetary relief. *Id.* at 279-80. "A party sufficiently proves that monetary damages are not adequate when it brings forward evidence, in the form of affidavits,

declarations, or any other support, that shows imminent harm that is difficult to quantify." *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 697 (N.D. Tex. 2015).

While exceptional economic harm may constitute irreparable injury where the existence of the business will likely cease, *see Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989), where bankruptcy is imminent, *see Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975), or where the plaintiff is unable to fund ongoing litigation, *see Milsen Co. v. Southland Corp.*, 454 F.2d 363, 367 (7th Cir. 1971), ACGTC failed to present credible evidence of any of these circumstances. As noted, the record is devoid of any evidence whatsoever. Even though ACGTC was put on notice that the Court would conduct a hearing on the motion for preliminary injunction, ACGTC still failed to put on evidence at the hearing. With no evidence of irreparable harm to consider, the Court cannot grant a preliminary injunction.[53]

The absence of evidence does not aid an amended complaint that is already unclear as to what harm ACGTC claims its members suffered. Regardless, ACGTC offers no explanation as to why monetary damages would be an insufficient remedy. It is true that ACGTC professes in its complaint that it is not seeking monetary damages,[54] but it is ACGTC's burden in seeking injunctive relief to come forward with evidence that monetary damages cannot remedy the harm suffered. *See Dennis Melancon, Inc.*, 703 F.3d at 279-80. ACGTC has not done so. Because ACGTC has failed to establish irreparable harm, the Court need not analyze the remaining three requisites for a preliminary injunction.

Accordingly, the motion for a preliminary injunction is DENIED.

---

[53] Not only did ACGTC fail to present evidence of irreparable harm, it also failed to explain how circumstances have changed since November 8, 2021, when this Court denied then-plaintiff WBT's motion for a TRO for want of irreparable harm. *See* R. Doc. 5.

[54] R. Doc. 10 at 1.

### B. Dismissal under Rule 12(b)(1) – no nexus to interstate commerce shown

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to challenge a court's subject-matter jurisdiction. "[A] claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory authority or constitutional power to adjudicate' the claim." *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018) (quoting *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012)). The party asserting jurisdiction bears the burden of proving that subject-matter jurisdiction exists. *Id.* "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "A motion to dismiss for lack of subject-matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claims entitling him to relief." *Sureshot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, 754 F. App'x 235, 235 (5th Cir. 2018) (citing *Wagstaff v. U.S. Dep't of Educ.*, 509 F.3d 661, 663 (5th Cir. 2007)).

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). And, if a court dismisses pursuant to Rule 12(b)(1), it must do so without prejudice. *Cox, Cox, Filo, Camel & Wilson, L.L.C. v. Sasol N. Am., Inc.*, 544 F. App'x 455, 456-57 (5th Cir. 2013) ("[T]o dismiss with prejudice under Rule 12(b)(1) is to disclaim jurisdiction and then exercise it. Our precedent does not sanction the practice ...."); *see also OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*, 2020 WL 5749166, at *2 (E.D. La. Sept. 25, 2020).

Defendants contend that the Court has no original or supplemental jurisdiction over ACGTC's claims because ACGTC "has failed to adequately state in [its] complaint the substantial and direct effect on interstate commerce, as required to bring a federal antitrust claim, which permits supplemental jurisdiction for the State law claims."[55]  A plaintiff bears the burden of proving that a court has subject-matter jurisdiction to hear an antitrust claim.  *See Ancar v. Sara Plasma, Inc.*, 964 F.2d 465, 469 (5th Cir. 1992) ("As an antitrust claimant, [a plaintiff] has the burden of establishing that the alleged proscribed practices affect interstate commerce."). "[J]urisdiction may not be invoked under [the Sherman Act] unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce. To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings ...." *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980); *see also Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 504 (5th Cir. 2011) ("A complaint alleging a Sherman Act claim must allege some nexus between the defendants' conduct and interstate commerce.").  A plaintiff need not quantify the adverse impact of a defendant's alleged unlawful conduct, but merely show that there was some effect on interstate commerce.[56] *Gulf Coast*, 658 F.3d at 505.  "Even when business activities are purely local, if 'it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.'"  *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 573 (1997) (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 258 (1964)).

---

[55] R. Doc. 17 at 1.
[56] "[I]f these allegations are controverted [the plaintiff] must proceed to demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." *McLain*, 444 U.S. at 242 (citing *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 202 (1974)).  Here, Defendants have controverted the claimed interstate commerce nexus.  Yet, ACGTC did not present any evidence of the interstate commerce nexus at the hearing.

11

Defendants say that it is "unfathomable" that entry restrictions put in place at both Nos. 1 and 2 would either restrain trade in interstate commerce or have a substantial and direct effect on interstate commerce.[57] And ACGTC failed to brief the interstate commerce issue.[58] In response to the Court's questions at the January 6, 2022 hearing, however, ACGTC identified national and international tourism as the interstate commerce nexus. Yet, no evidence was presented in support of this assertion. Tourism can be sufficient to establish an interstate commerce nexus for purposes of an antitrust claim. *See Gibbs v. Babbitt*, 214 F.3d 483, 492 (4th Cir. 2000) ("The relationship between red wolf takings and interstate commerce is quite direct – with no red wolves, there will be no red wolf related tourism, no scientific research, and no commercial trade in pelts."). For example, in *Gulf Coast Hotel-Motel Association*, the Fifth Circuit concluded that the economic activity of "bringing out-of-state tourists to hotels to play gulf" was sufficient to establish the jurisdictional nexus to interstate commerce required for an antitrust claim. *Gulf Coast*, 658 F.3d at 505. The case concerned two competing programs for the sale of golf vouchers to be used at certain courses across the Mississippi Gulf Coast. *Id.* at 502.

The *Gulf Coast* court observed that the allegations in the complaint were "sparse," yet held they were sufficient to survive a motion to dismiss. *Id.* at 506. It noted, with approval, that the complaint alleged the out-of-state tourist connection in three separate paragraphs, which stated: (1) that out-of-state tourists purchased the plaintiff hotel association's vouchers; (2) that out-of-state tourists purchased the defendant golf course association's vouchers; and (3) that out-of-state tourists played on the defendants' golf courses. *Id.* at 502-03, 507. But the court noted, with disapproval, that "[t]he complaint also allege[d], without further elaboration, that the voucher program affects interstate commerce." *Id.* at 503. "[T]he allegations in this complaint that [the

---

[57] R. Doc. 17-1 at 5.
[58] *See* R. Doc. 23.

defendants'] anticompetitive acts 'substantially affected interstate commerce' are not sufficient on their own," the court reasoned, but, when read as a whole, the complaint proved sufficient. *Id.* at 506.  Because the complaint alleged "that voucher customers 'are comprised of out-of-state persons visiting the Mississippi Gulf Coast,' that the golf courses at issue are used by out-of-state visitors and that [the plaintiff's] vouchers are sold through hotels and motels to patrons of those lodgings," it concluded that it was reasonable to infer "that money was sent across state lines, that tourists were attracted to the Mississippi Gulf Coast by the voucher program, and that if the alleged conspiracy [among the competing association and its golf course members to prevent consumers from using the plaintiff's program] were successful, consumers would not have the option of the [plaintiff's] voucher program." *Id.* at 507.  Accordingly, the court held that the effect of the defendants' conduct on interstate commerce was sufficient to support antitrust jurisdiction. *Id.* at 507.

Unlike the complaint at issue in *Gulf Coast*, ACGTC's complaint falls short of establishing an interstate commerce nexus.  In its complaint, ACGTC intones, again and again, that No. 1 "receives up to 90% of the cemetery tourism business in New Orleans and up to 500,000 visitors each year."[59]  ACGTC also states that the New Orleans cemetery tour industry "generates millions of dollars of tourism income each year for hundreds of directly and indirectly participating individuals and businesses from local, national, and international tourists."[60]  While these allegations, if proven, may establish that tourists from around the globe visit No. 1, they do not tie Defendants' conduct to interstate commerce. *See Gulf Coast*, 658 F.3d at 504 (concluding that a complaint must allege the nexus between defendants' conduct and interstate commerce).  Instead, ACGTC's complaint, even when read as a whole, falls prey to the deficiency the *Gulf Coast* court

---

[59] R. Doc. 10 at 4, 5, 7, 8, 9.
[60] *Id.* at 2.

13

identified in pleading at too general a level the interstate commerce nexus and, then, failing to link it to Defendants' allegedly injurious conduct. *See id.* at 507. Thus, ACGTC's generalized references to tourism in the complaint are not sufficient on their own to establish the interstate commerce nexus, and, as a result, fail to support subject-matter jurisdiction. Therefore, Defendants' motion to dismiss is GRANTED, but ACGTC will be given an opportunity to file a second amended complaint to cure the noted pleading deficiencies.[61]

## IV. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that ACGTC's amended motion for preliminary injunction (R. Doc. 16) is DENIED for failure to establish irreparable harm.[62]

IT IS FURTHER ORDERED that Defendants' motion to dismiss for lack of jurisdiction (R. Doc. 17) is GRANTED. ACGTC has fifteen (15) days from the date of this Order & Reasons to file a second amended complaint to cure the pleading deficiencies in the amended complaint noted herein.[63]

---

[61] In addition to the concerns discussed above, *supra* note 43, Defendants' motion to dismiss raises other questions the Court does not now answer but which ACGTC may want to address in its second amended complaint. Defendants contend that ACGTC has failed to establish antitrust standing. Standing to bring an antitrust claim requires a plaintiff to show: (1) "injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct"; (2) antitrust injury; and (3) "proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The "proper plaintiff" inquiry considers "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988). ACGTC should ensure that its second amended complaint satisfies the requisites for antitrust standing.

Defendants also argue that ACGTC has failed to allege key elements of its antitrust claims. For example, Defendants highlight ACGTC's failure to define the relevant product and geographic market. ACGTC should ensure that its second amended complaint addresses these additional concerns.

[62] As a housekeeping matter, IT IS FURTHER ORDERED that WBT's motion for temporary restraining order and preliminary injunction (R. Doc. 2) is DENIED as moot as WBT is no longer a party to the action.

[63] Rule 15 allows a court to grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Fifth Circuit has recognized that "[i]n view of the consequences of dismissal on the complaint alone, and the pull to

New Orleans, Louisiana, this 27th day of January, 2022.

                                              _____
                                              BARRY W. ASHE
                                              UNITED STATES DISTRICT JUDGE

---

decide cases on the merits rather than on the sufficiency of the pleadings, district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).