UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| NEW ORLEANS ASSOCIATION | § | Case No. 2:21-cv-02051-BWA-MBN |
| of CEMETERY TOUR GUIDES and | § | (Antitrust) |
| COMPANIES | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | SECOND AMENDED AND |
| | § | SUPPLEMENTAL COMPLAINT WITH |
| NEW ORLEANS ARCHDIOCESAN | § | REQUEST FOR INJUNCTIVE RELIEF |
| CEMETERIES d.b.a. NEW ORLEANS | § | |
| CATHOLIC CEMETERIES and | § | |
| CEMETERY TOURS NOLA LLC, | § | |
| Defendants. | § | |

## I. PARTIES

1.      Plaintiff, Association of Cemetery Tour Guides and Companies L3C d.b.a. New Orleans Association of Cemetery Tour Guides and Companies ("ACTGC"), is a low-profit limited liability company organized under the laws of the State of Louisiana. ACTGC may be served through undersigned counsel. ACTGC has a website at www.actgc.org and was organized in 2021. ACTGC's purpose statement on its website homepage lists three goals: (1) protect industry and public rights relating to cemeteries, (2) advance industry and public education relating to cemetery law, and (3) preserve cemeteries to benefit society and lessen the burdens of government. ACTGC's membership consists of tour guides and tour companies licensed by the City of New Orleans who provided cemetery tours at St. Louis Nos. 1 and 2 until defendants' conduct made it impossible for them to continue. For the duration of this litigation, ACTGC membership is closed to defendants and their tour guides. ACTGC currently has 76 members.

2.      Defendant, New Orleans Archdiocesan Cemeteries d.b.a. New Orleans Catholic Cemeteries ("NOAC"), is a religious nonprofit corporation incorporated under the laws of the

State of Louisiana. NOAC is the state registered cemetery authority[1] for 14 public cemeteries, including St. Louis Cemeteries Nos. 1 and 2 (individually "No. 1" and "No. 2," together "Nos. 1 and 2"), two of the oldest extant cemeteries in New Orleans where the remains of numerous famous, historical, and otherwise culturally significant individuals are interred so that the general public can commemorate their lives and accomplishments. NOAC may be served with process on its registered agent for service, Jeffrey J. Entwisle, at 7887 Walmsley Ave., New Orleans, LA 70125. Undersigned counsel has confirmed with NOAC, through its General Counsel, that NOAC is not a party to or affected by the ongoing Chapter 11 bankruptcy affecting other entities of the Archdiocese of New Orleans.

3.      Defendant, Cemetery Tours NOLA LLC ("CTN"), is a limited liability company organized under the laws of the State of Louisiana on June 22, 2021. CTN may be served with process on its registered agent for service, Michael Valentino, at 1501 Lafitte Ave., New Orleans, LA 70112.

## II. <u>JURISDICTION, VENUE, COMMERCE, AND STANDING</u>

### A. Jurisdiction

4.      This is an action under <u>Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2</u>, <u>La. R.S. §§51:122-123</u>, as well as <u>§8:1 *et seq.*</u> and Louisiana cemetery custom to restrain anticompetitive conduct by defendants within the cemetery tour industry ("Relevant Service Market") within New Orleans ("Relevant Geographic Market"), which is focused almost exclusively on Nos. 1 and 2. Defendants' anticompetitive conduct is facilitated by NOAC's

---

[1] La. R.S. §8:1(8) ("'Cemetery authority' means any person, firm, corporation, limited liability company, trustee, partnership, association or municipality owning, operating, controlling or managing a cemetery or

violation of the general public's realty right to free and reasonable access to public cemeteries. Generally speaking, the "outer boundaries" of the relevant product market includes all the firms selling, from the perspective of consumers, "reasonably interchangeable" products or services with significant *price cross-elasticity of demand* among them—i.e., good substitutes in the eyes of consumers.[2] Nos. 1 and 2 receive up to 90% of the Relevant Service Market within the Relevant Geographic Market because there are no public cemeteries that can be substituted for what Nos. 1 and 2 offer in history, proximity to the French Quarter, the specific individuals interred therein, etc. For example, a Voodoo practitioner does not want to go anywhere else and will have come to New Orleans specifically to see No. 1.

5.      The court has original jurisdiction over the lawsuit pursuant to 15 U.S.C. §§4, 15, 25 and 28 U.S.C. §§1331, 1337. Both defendants are participants in the Relevant Geographic Market and Relevant Service Market and have conspired to exclude all other competitors, including all ACTGC members, from providing tours in Nos. 1 and 2. No. 1 is by far the most popular cemetery in New Orleans for locals and tourists, in part because it is the oldest cemetery in New Orleans and one of the ten oldest in the nation still in operation and receives approximately 500,000 visitors in a year. Nos. 1 and 2 make up as much as 90% of the Relevant Service Market within the Relevant Geographic Market because of their long histories, proximity to the French

---

holding lands within this state for interment purposes.").

[2] See, e.g., Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross elasticity of demand between the product itself and substitutes for it."); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481-82 (1992) (explaining that the relevant product market is determined by product choices available to consumers and that it includes products having reasonable interchangeability in the eyes of consumers); Duty Free Americas, Inc. v. Estee Lauder Cos., 797 F.3d 1248 (11th Cir. 2015) (noting that courts pay "particular attention" to cross-elasticity of demand); Se. Mo. Hosp., supra, 642 F.3d at 617 ("A relevant [product] market is made up of products that consumers view as reasonable substitutes."); PSKS, Inc. v. Leegin Creative Leather Prods., 615 F.3d 412, 417 (5th Cir. 2010) ("A proposed product market must include 'all commodities reasonably interchangeable by consumers for the same purposes.'"); Little Rock Cardiology Clinic PA v. Baptist Health, 591 F.3d 591, 596 (8th Cir. 2009) ("A court's determination of the limits of a relevant product

Quarter, and the many famous people interred there and decades or even a century of advertising as tourist attractions.

6.      The court has supplemental jurisdiction under 28 U.S.C. §1367 as well as La. C.C.P. Art. 1871 *et seq.*, La. Const. Art. 5, § 16(A), and La. R.S. §51:129 over defendants' anticompetitive conduct and NOAC's breach of its obligations as a cemetery authority of a public cemetery— i.e., NOAC has unreasonably closed the public cemeteries Nos. 1 & 2 to the nonpaying general public and has fixed prices for entry and mandatory tours provided only by CTN—because these state law claims substantially mirror the federal law claims within the court's original jurisdiction and form part of the same case or controversy under Article 3 of the U.S. Constitution.

## B. Venue

7.      Venue is proper in this district under 15 U.S.C. §22; 28 U.S.C. §1391(b)(1) and (2); La. C.C.P. Arts. 2, 42 *et seq.*, 80, and 3655-3663; La. R.S. §51:131; and La. Const. Art. 5, § 16(A). All defendants reside in, Nos. 1 and 2 are located in, and a substantial part of the events or omissions giving rise to this claim occurred in Orleans Parish.

## C. Interstate Commerce

8.      The federal antitrust laws were enacted under Congress's constitutional power to regulate interstate commerce. Each federal antitrust statute, by its own terms, requires that the challenged conduct or parties affect interstate commerce to some extent. Additionally, absent the requisite effect on interstate commerce, a court lacks subject-matter jurisdiction. The scope of the

---

market requires inquiry into the choices available to consumers.").

coverage of the antitrust laws has expanded as the scope of Congress's power under the Commerce Clause has expanded through the years. The plaintiff must allege and prove either that defendants' conduct was in interstate commerce or substantially affected interstate commerce.[3] The standard for sufficiently alleging and proving the interstate-commerce element, although confusing, is very lenient.[4] Very few antitrust cases today are dismissed for lack of effect on interstate commerce, still, "some allegations regarding a defendant's interstate dealings are required."[5] Tourism can be sufficient to establish an interstate commerce nexus for purposes of an antitrust claim.[6]

9.     Defendants' conduct is in interstate commerce and substantially affects interstate commerce. As with most ACTGC members (when they were still marketing tours at No. 1 and 2), defendants advertise their tours at No. 1 on both of their websites and presumably elsewhere on the Internet, which has an obvious nexus with interstate and foreign commerce. Most if not all related service providers are based outside of Louisiana. Customers located around the world, including in the other 49 states, typically book a tour before traveling to New Orleans, which includes paying defendants in advance as confirmed on the CTN website.[7] Contract terms are offered and accepted and payment transacted, even for someone in the City of New Orleans reserving a tour online, cross state and often international boundaries to be received and

---

[3] E.g., Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738 (1976); Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n, 658 F.3d 500 (5th Cir. 2011).

[4] See generally Summit Health v. Pinhas, 500 U.S. 322 (1991); see also N. Tex. Specialty Physicians v. FTC, 528 F.3d 346 (5th Cir. 2008).

[5] Villare v. Beebe Med. Ctr., 630 F. Supp. 2d 418, 425 (D. Del. 2009); see also Poling v. K. Hovnanian Enters., Inc., 32 Fed. App'x 32 (3d Cir. 2002) (Table) (opinion reprinted at 2002-1 Trade Cas. (CCH)   73,683) (dismissing complaint where case involved one real-estate transaction that could have no significant effect on interstate commerce); Wahi v. Charleston Area Med. Ctr., 2004-2 Trade Cas. (CCH)   74,611 (S.D.W. Va. 2004) (dismissing case where the complaint did not even mention interstate commerce).

[6] See Gibbs v. Babbitt, 214 F.3d 483, 492 (4th Cir. 2000); Gulf Coast Hotel-Motel Ass'n v. Mississippi Gulf Coast Golf Course Ass'n, 658 F.3d 500, 505, 2011 Trade Cases P. 77610 (5th Cir. 2011).

processed by out-of-state service providers. NOAC advertises for CTN with a link on the NOAC website page for No. 1.[8] This link most likely crosses state and national boundaries to redirect to CTN's website, where CTN advertises the "St. Louis Cemetery No. 1 Official Tour," thereby further demonstrating NOAC's control over the tours.[9] Eventually, the out-of-state customers arrive in the City of New Orleans to complete their contract by attending the reserved and purchased tour. At the end of the tour, a customer often gives their tour guide a tip, using United States currency they have either brought with them from out of state or withdrawn from a local cash dispensing machine drawing from their bank account out of state. Afterwards, many customers return home and post online comments and reviews about the tour they attended. If any irregularities arose in connection with a purchased tour, usually those disputes are discussed and eventually resolved online (again involving interstate and international communications) or by phone across state lines or national borders. If a full or partial refund is granted, then that transaction also involves. Because an Internet presence and online payment processing are not accomplished by any of the parties or their customers, they all contract with service providers who are mostly outside of the State of Louisiana.

10.     Defendants' conduct substantially affects interstate commerce. Defendants have effectively seized control of up to 90% of the Relevant Service Market within the Relevant Geographic Market. The Relevant Service Market within the Relevant Geographic Market generates millions of dollars of tourism income each year for hundreds of directly and indirectly participating individuals and businesses, both local and out-of-state, from local, national, and foreign tourists who come to New Orleans to visit Nos. 1 and 2 to learn about and pay their

---

[7] CTN website, payment page, (February 11, 2022), https://cemeterytourneworleans.com/.
[8] NOAC website, page St. Louis Cemetery No. 1, (February 9, 2022), https://nolacatholiccemeteries.org/st-louis-cemetery-1.

respects to the famous and lesser-known individuals interred therein and learn about and see the very distinctive (for the United States) French, Spanish, and Creole cemetery customs and architecture there.

11.     The Relevant Service Market within the Relevant Geographic Market focuses almost exclusively on Nos. 1 and 2, which receive up to 90% of the tours. Nos. 1 and 2 are two of the oldest cemeteries in the country, have been recognized by several state and national honors, are free to access as public cemeteries, and are the only two historical cemeteries within reasonable walking distance from the French Quarter. For these reasons, they have always been the focus of tour marketing. While all excluded tour guides and companies are no longer marketing Nos. 1 and 2, the effect of continuous marketing, particularly online, will endure for years, thereby giving defendants the sole benefit of that investment by the industry for as long as defendants retain their monopoly.

12.     NOAC currently only allows one tour at No. 1, defendants' tour. The prices are fixed by defendants due to a complete lack of competition, all of which is denied access to Nos. 1 and 2. Not only have defendants taken all of the competition's business at Nos. 1 and 2, but defendants can also now arbitrarily set any price they want for a tour of No. 1. Currently the price defendants charge is $25.00 per person. Prior to enacting their scheme, the price at the gate for a tour of No. 1 was $20.00 per person. Therefore, customers now pay at least $5.00 more per person for only one type of tour at No. 1, whereas previously numerous distinct tour with varying topics, guides, paths, durations, and prices were available for competitive selection by customers.

13.     Back when they still had access to Nos. 1 and 2, some ACTGC members charged as

---

[9] CTN website, homepage, (February 9, 2022), https://cemeterytourneworleans.com/.

much as $25.00 for a combined tour of the French Quarter, Voodoo sites, and No. 1. But many ACTGC members focused their tours exclusively on No. 1 and charged less than $25.00. This means that defendants' current price is above the prior market for the same service. Therefore, defendants' customers pay more for less and have no other tour options if they want to get into Nos. 1 or 2. No. 2, only three blocks away from No. 1, remains closed as of this filing, thereby redirecting all tourism to No. 1. The reason NOAC provides on its website is that "St. Louis Cemetery No. 2 remains locked everyday due to vandalism and other issues. All tours are suspended - for an appointment to visit your family tomb, please call 504-596-3050."[10] Nos. 1 and 2 are the only historic cemeteries within reasonable walking distance from the French Quarter, which is where tourists traditionally stay and walk about without the need to pay for a rental car or taxi.

## D. Standing

14.     Aside from ACTGC's representational standing to bring the claims of its members before the Court, there are three types of standing: (1) constitutional standing, which enforces the constitutional case-or-controversy requirement, (2) prudential standing, which enforces judicially imposed limits on federal jurisdiction, and (3) statutory standing, which enforces the legislative limits of a statutory cause of conduct.[11] Standing must be satisfied for each claim and form of relief.[12]

---

[10] NOAC website, page St. Louis Cemetery No. 2, (February 9, 2022), https://nolacatholiccemeteries.org/st-louis-cemetery-2.

[11] Davis v. City of Phila., 821 F.3d 484, 487 (3d Cir.2016); see CGM, LLC v. BellSouth Telecomms., 664 F.3d 46, 52 (4th Cir.2011).

[12] Town of Chester v. Laroe Estates, Inc.,   U.S. , 137 S.Ct. 1645, 1650 (2017); Oregon Prescription Drug Monitoring Program v. U.S. Drug Enforcement Admin., 860 F.3d 1228, 1233 (9th Cir.2017); see WildEarth Guardians v. U.S. Bur. of Land Mgmt., 870 F.3d 1222, 1230 (10th Cir.2017); FiberLight, LLC v. National R.R.

### a. Representational Standing

15.     Plaintiff incorporates the entire detailed discussion of standing set forth in R. Doc. 23 as well as allegations of paragraphs 1 through 14 above, and 18 through 84 below.

16.     ACTGC does not have direct organizational standing. It was created, after this litigation was commenced, to include in this litigation the interests of numerous individuals and companies licensed by the City of New Orleans who are adversely affected by defendants' conduct.

17.     ACTGC has representational standing to bring this conduct on behalf of its members, currently numbering 76. First, one or more of its members has standing to bring each of the five claims, as further discussed below. Second, the interests at stake are germane to ACTGC's purpose set forth in its purpose statement[13]—(1) protect industry and public rights relating to cemeteries, (2) advance industry and public education relating to cemetery law, (3) preserve cemeteries to benefit society and lessen the burdens of government. And third, neither the claims nor the relief sought requires participation of ACTGC's individual members, who are all being harmed and only seek relief from the Court to stop the ongoing harm.[14]

### b. Constitutional

18.     Plaintiff incorporates the entire detailed discussion of standing set forth in R. Doc. 23 as well as allegations of paragraphs 1 through 17 above, and 28 through 84 below.

19.     Constitutional standing is satisfied by (1) an "injury in fact" (i.e., harm that is concrete

---

Passenger Corp., 81 F.Supp.3d 93, 105 (D.D.C.2015).

[13] ACTGC website, homepage, (February 11, 2022), https://www.actgc.org/.

[14] Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 342-343 (1977); Warth v. Seldin, 422 U.S. 490, pp. 498-518 (1975).

and actual or imminent, not merely conjectural or hypothetical), (2) causation (i.e., a fairly traceable connection between the plaintiff's injury and the defendant's alleged conduct), and (3) redressability (i.e., likelihood that the requested relief will remedy the alleged injury).[15] These requirements ensure that a plaintiff has a sufficiently personal stake in the outcome of the suit so that the parties are adverse.[16] Initially, the plaintiff may meet its burden of establishing standing by alleging in its complaint the nature of its injury resulting from the defendant's conduct.[17] However, whether on motion for summary judgment or at trial, the plaintiff will ultimately have to set forth specific facts necessary to support the claim.[18]

20.    ACTGC members are tour guides and companies licensed by the city of New Orleans to conduct tours in public spaces in the city. All ACTGC members have now been excluded by NOAC from visiting and providing their services in the public cemeteries Nos. 1 & 2, which make up approximately 90% of the Relevant Service Market within the Relevant Geographic Market. This is also a possessory action to enforce the real right of the general public (including the rights of relations, friends, and admirers of the deceased as well as city licensed guides who make their living from providing cemetery tours in the Relevant Service Market within the Relevant Geographic Market) to free and reasonable access to public cemeteries. NOAC is currently barring the nonpaying general public, including New Orleans licensed tour guides, friends, and relations (who cannot satisfy NOAC of their status) from entry into Nos. 1 and 2.

---

[15] Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009); Sprint Comms. Co. v. APCC Servs., 554 U.S. 269, 273–74 (2008); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992); Finkelman v. National Football League, 877 F.3d 504, 510–11 (3d Cir.2017); see Spokeo, Inc. v. Robins, U.S. , 136 S.Ct. 1540, 1547 (2016).
[16] W.R. Huff Asset Mgmt., 549 F.3d at 107; see Town of Chester, U.S. at , 137 S.Ct. at 1650; Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157–58 (2014).

21.     ACTGC members have multiple grounds for standing to bring a possessory action regarding their real rights in public cemeteries. They all reside in New Orleans and thus qualify as the general public. They are all licensed by the City of New Orleans to provide guided tours within the city, which includes at public cemeteries. Furthermore, some are relations or friends of individuals interred in Nos. 1 or 2 or both. Indeed, all ACTGC members assert that they are friends of everyone buried in Nos. 1 and 2; they know much more about the individuals interred there as well as the burial customs practiced and architectural styles exemplified there than most state residents. ACTGC members are experts with regards to Nos. 1 and 2.

22.     ACTGC conducted two member surveys during early registration in 2021, one begun on November 10, 2021 ("First Survey"),[19] and later replaced with the second begun November 14, 2021 ("Second Survey").[20] More recently, ACTGC communicated directly with several members.

23.     In the surveys and more recent communications, 12 members confirmed that they have one or more relations in Nos. 1 or 2. In violation of primary state law going back more than 200 years, NOAC is currently depriving these members of reasonable access to a public cemetery to visit their deceased relations; money could never make them whole.

24.     33 members confirmed that they have one or more friends in Nos. 1 or 2. In violation of primary state law going back more than 200 years, NOAC is currently depriving these members of free and reasonable access to a public cemetery to visit their deceased friends; money could never make them whole.

---

[17] Lujan, 504 U.S. at 561.
[18] Lujan, 504 U.S. at 561; see Sierra Club v. Jewell, 764 F.3d 1, 5 (D.C.Cir.2014).

25.     All of the other ACTGC members are experts with regards to Nos. 1 and 2. They know much more about the individuals interred there as well as the burial customs practiced and architectural styles exemplified there than most state residents because they make their living, or did, teaching others about the history and culture of New Orleans cemeteries. These members a licensed by the City of New Orleans to conduct tours in the public spaces in the city, including all public cemeteries, a profession that also extends back for centuries because New Orleans has always had tourists and its cemeteries have always been one of its most distinctive attributes attracting visitors in the early 1800s. In violation of primary state law going back more than 200 years, NOAC is currently depriving these members of free and reasonable access to a public cemetery to practice their profession and make a living. Money cannot make them whole when they can't feed or lose housing for themselves and their families because they can no longer practice their profession and have to learn a new profession or find a job for which they lack preparation, training, and experience. These are individuals usually working for themselves with few or no employees or independent contractors. They do not have life or health insurance, often cannot afford a car, much less car insurance. But may have spouses and children. Future money will not make them whole.

26.     28 members confirmed that they were forced to close their cemetery tour business completely when NOAC failed to reopen No. 1 soon after confirming that they would do so in the  NOAC email of June 11, 2020.[21] 19 members confirmed that they were forced to close their cemetery tour business completely when defendants reopened No. 1 only for defendants' tour. Many other members are currently at risk of having to close down their own cemetery tour

---

[19] https://www.surveymonkey.com/stories/SM-YZ9ZSRLW/.
[20] https://www.surveymonkey.com/stories/SM-NT6TNRLW/.
[21] R. Doc. 2-1 at 4 and Ex. B.

business and find a different profession. Directly because of their anticompetitive scheme in violation of Sections 1 and 2 of the Sherman Act and La. R.S. Title 51 Sections 122 and 123, defendants have forced or are currently threating the closure of these members' cemetery tour businesses. Money could never make them whole; they have already lost or are at risk of losing their ability to independently earn a living from doing something they love and have worked hard for years to do very well. They simply cannot compete with defendants at the current price or tours at No. 1 because of the additional business costs of transportation, for the members and customers, to other public cemeteries farther away from where they live and where the tourists usually are located and the lack of interest in other public cemeteries. Defendants have fixed their prices above the prior market rate but not so high that the other cemetery tour guides and companies persuade customers to visit a different public cemetery from the two oldest in the city, next to the French Quarter with the specific historical figures the customers have already read so much about in advertisements.

27.     In 2015, NOAC decided to end centuries of practice and tradition by violating its legal obligation to provide free public access to the public cemeteries St. Louis Cemetery No. 1. NOAC began requiring and sharing in the revenue from mandatory entry and tour fees. This conduct marked NOAC's entry into the tourism industry by creating the revenue stream that NOAC and CTN now conspire to increase through fixed prices and direct exclusively to CTN and NOAC. Defendants' conduct listed above directly caused concrete harm to ACTGC members, and the Court can stop that harm by enforcing Louisiana primary and secondary law establishing and confirming the right of ACTGC members, as interested members of the general public, to have free and reasonable access to public cemeteries, including Nos. 1 and 2. This relieve will immediately stop defendants' ability to monopolize up to 90% of the Relevant

Service Market within the Relevant Geographic Market and force defendants to compete with their cemetery tour pricing.

### c. Prudential

28.     Plaintiff incorporates the entire detailed discussion of standing set forth in R. Doc. 23 as well as allegations of paragraphs 1 through 27 above, and 32 through 84 below.

29.     Prudential standing refers to judicially created limitations on a court's exercise of jurisdiction.[22] These limitations include a general prohibition against a party raising another person's legal rights and a rule barring adjudication of generalized grievances that would be more appropriately addressed by the representative branches.[23]

30.     In <u>Lexmark Int'l v. Static Control Components, Inc.</u>, the Supreme Court addressed the principles of prudential standing and clarified that the "zone-of-interests" test is actually a question of statutory standing rather than prudential standing, and therefore will be addresses there.[24] The Court also questioned whether the generalized-grievances test is actually a question of constitutional standing and declined to address the proper categorization of third-party standing.[25] After Lexmark Int'l, it is unclear what remains of prudential standing.

31.     Suffice it to assert that ACTGC is authorize by state and federal law to bring this action on behalf of its members, one or more of whom have standing to bring these specific, rather than

---

[22] <u>Elk Grove Unified Sch. Dist. v. Newdow</u>, 542 U.S. 1, 11 (2004); <u>CGM, LLC</u>, 664 F.3d at 52.

[23] <u>Lexmark Int'l v. Static Control Components, Inc.</u>, 572 U.S. 118, 126 (2014); see <u>Elk Grove Unified Sch. Dist.</u>, 542 U.S. at 12 (prudential standing prevents courts from being called on to decide abstract questions of wide public significance when other government branches may be better suited to address those questions or when judicial intervention is unnecessary to protect a person's right).

[24] See <u>Lexmark Int'l</u>, 572 U.S. at 127 & n.3; <u>Superior MRI Servs. v. Alliance Healthcare Servs.</u>, 778 F.3d 502, 506 (5th Cir.2015).

[25] See <u>Lexmark Int'l</u>, 572 U.S. at 127 n.3.

generalized, grievances against defendants. Furthermore, these grievances are suffered by one or more ACTGC members and not by some uninvolved third-party.

d. Statutory

32.    Plaintiff incorporates the entire detailed discussion of standing set forth in R. Doc. 23 as well as allegations of paragraphs 1 through 31 above, and 38 through 84 below.

33.    Statutory standing applies only to legislatively created causes of action and requires that the statute in question authorize a particular plaintiff to bring the suit.[26] To determine whether a plaintiff has statutory standing, the court applies the zone-of-interests test, which asks whether a statutory cause of action encompasses a particular plaintiff's claim.[27] Statutory standing is purely a matter of statutory construction.[28]

34.    Standing to bring an antitrust claim requires a plaintiff to show: (1) "injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct"; (2) antitrust injury; and (3) "proper plaintiff status, which assures that other parties are not better situated to bring suit."[29]

35.    ACTGC has capacity, under Louisiana law, to bring these claims as an unincorporate association representing its members.

36.    ACTGC's members have been and continue to be directly harmed by defendants' conduct of excluding all ACTGC members from Nos. 1 and 2, which make up approximately

---

[26] CGM, LLC, 664 F.3d at 52; see Lexmark Int'l, 572 U.S. at 128 & n.4; Graden v. Conexant Sys., 496 F.3d 291, 295 (3d Cir.2007).

[27] See Bank of Am. Corp. v. City of Miami, U.S. , 137 S.Ct. 1296, 1302–03 (2017); Lexmark Int'l, 572 U.S. at 128–29 & n.4; Ray Charles Found. v. Robinson, 795 F.3d 1109, 1120–21 (9th Cir.2015); Public Citizen v. Federal Election Comm'n, 788 F.3d 312, 319 (D.C.Cir.2015).

[28] CGM, LLC, 664 F.3d at 52–53; Graden, 496 F.3d at 295.

[29] Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc., 123 F.3d 301, 305 (5th Cir. 1997).

90% of the Relevant Service Market within the Relevant Geographic Market. As a result of defendants' conduct, ACTGC members have been forced out of the Relevant Service Market within the Relevant Geographic Market or risk being forced out or have been unable to enter the Relevant Service Market within the Relevant Geographic Market after long study and investment or, at a minimum, have lost a large percentage of their prior revenue derived from selling their services in the Relevant Service Market within the Relevant Geographic Market.

37.     As ACTGC's members have each individually suffered this harm, they are each the property person to have them brought on their behalf by ACTGC, in order to conserve the Court's resources and expedite resolution.

### III. CLAIMS FOR RELIEF

First Claim for Relief: Price Fixing in Violation of Section 1 of the Sherman Act

38.     Plaintiff incorporates the allegations of paragraphs 1 through 37 above.

39.     Price fixing is an unreasonable restraint on trade and commerce and can take many forms, and any agreement that restricts price competition violates the law. Price fixing schemes are *per se* violations of the Sherman Act. The Supreme Court has stated that "[n]o antitrust offense is more pernicious than price fixing."[30] The manager of CTN explained the details of defendants' fixed price—i.e., $25.00 per person or $5.00 more than before defendants' scheme began—in an email to the owner of one of ACTGC's largest member companies.[31] The email was a follow up to a meeting the day before and explains that CTN, a "new company," has an agreement with NOAC to exclude all competition and set the price for access via a required tour.

---

[30] FTC v. Ticor Title Ins. Co., 504 U.S. 621, 639 (1992); see also Freeman v. San Diego Ass'n of Realtors, 322

40.      NOAC first entered into the Relevant Service Market within the Relevant Geographic

Market in 2015, by closing No. 1 to the nonpaying general public and requiring a tour fee to

enter a public cemetery that had been free to the public since its founding in 1789, in violation of

state primary law—i.e., La. Revised Statute Title 8 and over 200 years of custom. This is when

NOAC began to conduct tourism business at its public cemeteries, in violation of La. Revised

Statute Title 8 Section 306(B), which provides that "[p]roperty dedicated to cemetery purposes

shall be held and used exclusively for cemetery purposes …." NOAC closed Nos. 1 and 2 to all

but relatives known to NOAC due to the pandemic. NOAC has since reopened No. 1 but keep

No. 2 closed in order to maximize tourism at No. 1 for defendants, with all other cemetery tour

guides and companies excluded from access and, therefore, from offering their cemetery tours in

approximately 90% of the Relevant Service Market within the Relevant Geographic Market.

41.      Defendants, both relatively recent entrants into the Relevant Service Market within the

Relevant Geographic Market, have excluded all competition (not to mention blocking new

entrants to the Market) from up to 90% of the Relevant Service Market within the Relevant

Geographic Market to allow them to charge a higher fixed entry fees and a higher fixed

mandatory tour fee to access a public cemetery that (a) has always been open to the public since

it was established in 1789, (b) is located on the edge of the current French Quarter, and (c)

receives up to 90% of the Relevant Service Market within the Relevant Geographic Market and

up to 500,000 tourism related visitors each year.

42.      Defendants' conduct unfairly and unreasonably restrains trade by fixing the prices

applied to up to 90% of the Relevant Service Market within the Relevant Geographic Market.

---

F.3d 1133, 1144 (9th Cir. 2003) ("No antitrust violation is more abominated than the agreement to fix prices.").
[31] R. Doc. 2-1 at 4 and Ex. A.

Consumers will have no benefit from competition or selection regarding the topics and path of the tour. They pay more for less selection and less service.

43.    Collusive agreements are usually reached in secret, with only the participants having knowledge of the scheme. Defendants do not appear to have colluded; their intentions have been relatively open to the industry. It seems likely that defendants have stumbled onto their illegal path. Nevertheless, their scheme is contrary to federal law.

Second Claim for Relief: Monopolization of the Relevant Service Market
within the Relevant Geographic Market in Violation of Section 2 of the Sherman Act

44.    Plaintiff incorporates the allegations of paragraphs 1 through 43 above.

45.    Market allocation schemes are agreements in which competitors divide markets among themselves.

46.    In 2015, despite being a religious nonprofit, NOAC saw a tourism business opportunity as a new revenue source by leveraging the popularity (No. 1 constitutes up to 90% of the Relevant Service Market within the Relevant Geographic Market and up to 500,000 visitors each year) of its centuries old public cemeteries listed on multiple national registries. All NOAC had to do was seize a public cemetery and turn it into a private tourist attraction.

47.    NOAC chose to break state law, including over 200 years of custom, by closing the centuries old public cemetery No. 1 to the general public in 2015.

48.    NOAC and CTN have agreed for NOAC to exclude all other competitors from the No. 1 in exchange for a larger portion of revenue (from the fixed prices) as well as final approval of all topics and discussion during and the path of the tours.

49.      Defendants' scheme will unfairly and unreasonably monopolize trade by excluding all other industry participants, previous and new, from offering Services in up to 90% of the Relevant Service Market within the Relevant Geographic Market.

50.      Collusive agreements are usually reached in secret, with only the participants having knowledge of the scheme. Defendants do not appear to have colluded; their intentions have been relatively open to the industry. It seems likely that defendants have stumbled onto their illegal path. Nevertheless, their scheme is contrary to federal law.

Third Claim for Relief: Price Fixing in Violation of La. R.S. Title 51 Section 122

51.      Plaintiff incorporates the allegations of paragraphs 1 through 50 above.

52.      Restraint of trade is prohibited by La. R.S. §51:122, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal."

53.      In violation of its authority and the general public's real rights, NOAC has entered into the Relevant Service Market within the Relevant Geographic Market by closing No. 1 to the nonpaying general public in 2015 and collecting required entry and tour fees.

54.      Defendants, both relatively recent entrants into the Relevant Service Market within the Relevant Geographic Market, are excluding all their competition from Nos. 1 & 2 and charging a fixed entry fees and a fixed required tour fee to access a public cemetery that (a) has always been open to the public since it was established in 1789, (b) is located on the edge of the current French Quarter, and (c) makes up as much as 90% of the Relevant Service Market within the

Relevant Geographic Market receiving up to 500,000 tourism related visitors each year.

55.     Defendants' conduct unfairly and unreasonably allows defendants to arbitrarily fix the Service price for approximately 90% of the Relevant Service Market within the Relevant Geographic Market.

56.     Collusive agreements are usually reached in secret, with only the participants having knowledge of the scheme. Defendants do not appear to have colluded; their intentions have been relatively open to the industry. It seems likely that defendants have stumbled onto their illegal path. Nevertheless, their scheme is contrary to state law.

Fourth Claim for Relief: Monopolization of the Relevant Service Market within the Relevant Geographic Market in Violation of La. R.S. Title 51 Section 123

57.     Plaintiff incorporates the allegations of paragraphs 1 through 56 above.

58.     Monopolizing trade is prohibited by La. R.S. §51:123, which provides that "[n]o person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state."

59.     In violation of its authority and the general public's real rights, NOAC has entered into the Relevant Service Market within the Relevant Geographic Market by closing No. 1 to the nonpaying general public in 2015 and collecting required entry and tour fees.

60.     Defendants, both relatively recent entrants into the Relevant Service Market within the Relevant Geographic Market, are excluding all their competition from Nos. 1 & 2 and charging a fixed entry fees and a fixed required tour fee to access a public cemetery that (a) has always been open to the public since it was established in 1789, (b) is located on the edge of the current

French Quarter, and (c) makes up as much as 90% of the Relevant Service Market within the Relevant Geographic Market receiving up to 500,000 tourism related visitors each year.

61.     Defendants' scheme will unfairly and unreasonably monopolize trade by excluding all other industry participants from approximately 90% of the Relevant Service Market within the Relevant Geographic Market.

62.     Collusive agreements are usually reached in secret, with only the participants having knowledge of the scheme. Defendants do not appear to have colluded; their intentions have been relatively open to the industry. It seems likely that defendants have stumbled onto their illegal path. Nevertheless, their scheme is contrary to state law.

Fifth Claim for Relief: Action to Enforce Real Right, Alternatively Possessory Action, Regarding Unlawful Restrictions on Relations and Exclusion of Friends and the General Public from Public Cemeteries pursuant to La. C.C.P. arts. 3654-3663

63.     Plaintiff incorporates the allegations of paragraphs 1 through 62 above.

64.     NOAC closed all of its cemeteries for an extended period due to the ongoing COVID-19 pandemic. Late in 2021, plaintiff's members began to learn that NOAC intended to reopen No. 1 but only to tours it provides with CTN, thus prompting this litigation.

65.     On or about November 26, 2022, NOAC opened No. 1 but only to tours approved (not only for accuracy but also for content) in advance by NOAC and provided by CTN, who shares the revenue with NOAC. No. 2 has remained closed to this day. Nos. 1 and 2 are public cemeteries on land dedicated to the general public.

66.     NOAC's responsibilities as a cemetery authority are broad but restricted to cemetery business and cemetery purposes because NOAC only has the right to conduct cemetery business at its public cemeteries.[32] Cemetery business has never included charging an entry fee, requiring a tour fee, tourism in general, much less censoring discussion at or permanently excluding friends and the general public from a public cemetery. NOAC's conduct is not authorized by law and not reasonable. NOAC generally blames vandalism for its entry into the Relevant Service Market within the Relevant Geographic Market, but vandalism has been a problem for centuries. NOAC also implies that tour guides in general are at fault for vandalism without any more credible proof than an article about an unlicensed tour guide. NOAC is responsible for stopping vandalism and for ensuring only licensed tour guides conduct tours at its cemeteries, but has failed to do so in the past century and also in the past six years while it was receiving tourism revenue.

67.     NOAC's current policies violate the rights of relations and friends of the people interred in Nos. 1 and 2 and the general public to have reasonable access for visitation. No. 1 is a public cemetery accessible directly from public streets and sidewalks. There is no need to cross private land to access the public cemetery No. 1 so the right of access is not limited to relations and friends of the deceased. Even if one of NOAC's cemeteries were surrounded by private land owned by NOAC, NOAC does not have the right to arbitrarily decide who is a relation or friend.

68.     A cemetery[33] that is open to the public for the interment of human remains is a <u>public cemetery</u> under Louisiana primary law—i.e., custom and legislation.[34] Ownership of the land on

---

[32] La. R.S. §§8:204 and 306(B).

[33] La. R.S. §8:1(7) ("'Cemetery' means a place used or intended to be used for the interment of the human dead.").

[34] La. C.C. arts. 1-3; see <u>Vidrine v. Vidrine</u>, 225 So.2d 691, 692 and 697 (La. App. 1969)(Third Circuit

which a public cemetery is located is irrelevant because the land is deemed to have been dedicated, either formally or informally, as a cemetery for the benefit of the general public, thereby investing the general public with real rights ensuring free and reasonable access for traditional purposes.[35] Both of these customs have been consistently recognized in the jurisprudence of Louisiana. Louisiana courts have recognized, and Louisiana Attorney General opinions have referenced, an irrevocable covenant, running with land dedicated for interment, that creates a real right in the form of an implied contractual relationship binding the landowner irrevocably.[36] The Louisiana Supreme Court in 1940, and various appellate courts since, have confirmed that Louisiana custom and more recent legislation provide that the reservation of a tract of land for use by the public as a cemetery and its continued use by the general public as a burial ground is legally sufficient to constitute dedication of the property for public use.[37] Where land has been informally dedicated for use as a cemetery, ownership of the land remains with the record owner, subject to an irrevocable dedication for public use.[38]

69.     The custom of public cemeteries being free and open to the public for visitation is such a longstanding and obvious custom that it has never been the subject of Louisiana legislation or

---

presumed defendant recognizes he is prohibited from interfering with public use of cemetery and recognizing historical real right of relatives and friends to unrestricted right to visit and care for graves); Roberts v. Stevens, 389 So.2d 782, 784 (La. App 1980)(Third Circuit following Vidrine); St. James Methodist Church of Hahnville, In re, 666 So2d 1206, 1209 (La. App. 1995)(Fifth Circuit citing and following Vidrine); and La. Atty. Gen. Op. Nos. 7-0182 (September 17, 2007), 8-0100 (June 19, 2008), 8-0186 (August 19, 2008).

[35] See Faust v. Mitchell Energy Corp., 437 So.2d 339 (La. App. 1983) (land dedicated to public use as a cemetery is exempt from taxes, tax sale, and acquisitive prescription).

[36] See Vidrine v. Vidrine, 225 So.2d 691, 692 and 697 (La. App. 1969)(Third Circuit presumed defendant recognizes he is prohibited from interfering with public use of cemetery and recognizing historical real right of relatives and friends to unrestricted right to visit and care for graves); Roberts v. Stevens, 389 So.2d 782, 784 (La. App 1980)(Third Circuit following Vidrine); St. James Methodist Church of Hahnville, In re, 666 So2d 1206, 1209 (La. App. 1995)(Fifth Circuit citing and following Vidrine); and La. Atty. Gen. Op. Nos. 7-0182 (September 17, 2007), 8-0100 (June 19, 2008), 8-0186 (August 19, 2008).

[37] Humphreys v. Bennett Oil Corp., 195 La. 531, 197 So. 222 (1940); Locke v. Lester, 78 So.2d 14 (La. App. 2d Cir. 1955); Roberts v. Stevens, 389 So.2d 782 (La.App.1980), 784.

[38] A. Yiannopoulos, Property, II La.Civ.L. Treatise (1980), Sec. 65 at 195.

jurisprudence. The jurisprudence only casually recognizes these customs in cases recognizing that "relations and friends" have a customary right to cross private property to access land on which a cemetery is located. There is no jurisprudence regarding who is a relation or friend because no cemetery authority has ever dared to challenge such a claim.

70.     NOAC's current mission statement announces that NOAC is only concerned with "family members and friends of the deceased," thereby evidencing its new tourism industry interests and restrictions on access to its cemeteries.[39] The Archdiocese of St. Louis still acknowledges the traditional role of Roman Catholic Cemeteries by keeping its cemeteries open "365 days a year" from 8:00 a.m. to 5:00 p.m. and confirms that "[t]he purpose of the rules of Catholic Cemeteries of the Archdiocese of St. Louis is to promote the ideals of Christian Burial by making the cemetery grounds a haven of comfort and peace, the continued welfare of the Cemetery as a whole and the well-being of lot holders and visitors. The rules are not arbitrary, but developed over decades of experience of what promotes the common good."[40]

71.     These same customs were reinforced by legislation in the 1974 through the enactment of Title 9 of the Revised Statutes, which confirms that a dedication of land for use as a cemetery is for the "benefit of the general public"[41] and permanent,[42] unless all human remains are first relocated by court order.[43] "Property dedicated to cemetery purposes shall be held and used exclusively for cemetery purposes"[44] Cemetery land is expressly exempted from standard

---

[39] NOAC website, page Mission Statement, (February 9, 2022), https://nolacatholiccemeteries.org/mission-statement.
[40] Archdiocese of St. Louis Catholic Cemeteries website, page Cemetery Rules, (February 9, 2022),, https://cemeteries.archstl.org/About-Us/Cemetery-Rules.
[41] La. R.S. §8:305.
[42] La. R.S. §8:304(A).
[43] La. R.S. §8:306(B).
[44] La. R.S. §8:306(B).

property law public policy; "[d]edication of land to cemetery purposes … is not invalid as violating any laws against perpetuities or the suspension of the power of alienation of title to or use of property but is expressly permitted and shall be deemed to be in respect for the dead, a provision for the interment of human remains, and a duty to and for the benefit of the general public."[45]

72.     NOAC saw a money-making, tourism-business opportunity to leverage the popularity of its centuries old public cemetery No.1, which is listed on multiple national registries into a new revenue source by entering into the Relevant Service Market within the Relevant Geographic Market. All NOAC had to do was seize the public cemeteries Nos. 1 & 2; treat them like privately owned cemeteries, and only reopen No.1, which constitutes up to 90% of the Relevant Service Market within the Relevant Geographic Market and up to 500,000 visitors each year; and charge mandatory, fixed fees for entry and tour, to be provided only by CTN.

73.     In 2015, NOAC chose to break state law and over 200 years of tradition by closing the public cemetery No. 1.

74.     Since 2020, NOAC has kept No. 2 closed to anyone but immediate family. This ongoing closure will cause the neighboring No. 1 to receive up to 90% of the Relevant Service Market within the Relevant Geographic Market, with only defendants'' Service allowed to be offered. Customers are not willing to pay for two tours—i.e., pay for one of ACTGC's members to escort them to No. 1 only to pay defendants for their cemetery tours to gain entry.

75.     NOAC has alleged since 2015 that it closed No. 1 to the nonpaying general public to stop vandalism and asserted that it would use its new tourism revenue to better protect No. 1.

---

[45] La. R.S. §8:305.

But upon information and belief vandalism has continued to occur because it occurs mainly at night, when No.1 is closed and unguarded, and it does not appear that the tourism revenue has been spent addressing vandalism or any other legitimate use.

76.     NOAC is religious nonprofit unlawfully demanding the public pay fixed fees to enter a public cemetery and restrict their access to the path of their tour with only a single list of topics for discussion preapproved by NOAC.

## IV. THE NEED FOR PRELIMINARY RELIEF

77.     ACTGC members, represented by ACTGC in these proceedings, seek to preserve the status quo[46] and satisfy the procedural and substantive requirements for injunctive relief. A movant seeking a preliminary injunction must establish (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant if the injunction is denied outweighs the potential harm to the non-movant if the injunction is granted; and (4) that granting the injunction will not disserve the public interest.[47]

### A. Likelihood of Success on the Merits

78.     It is substantially likely that ACTGC will prevail on the merits of one or more of its claims, any of which merit injunctive relief to end ongoing and avoid additional damage to ACTGC's members and the general public. Plaintiff has established a prima facia case for each

---

[46] The purpose of a preliminary injunction is to preserve the status quo pending a final determination of the merits. University of Tex. v. Camenisch, 451 U.S. 390, 395 (1981); Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A., 143 F.3d 688, 692 (2d Cir.1998), rev'd on other grounds, 527 U.S. 308 (1999); see Trump v. International Refugee Assistance Project,  U.S. , 137 S.Ct. 2080, 2087 (2017).

[47] Garcia v. Jones, 910 F.3d 188, 190 (5th Cir. 2018).

of its five claims based on the following facts, none of which have been contested by defendants,[48] thereby leaving only the disputed interpretation of relevant law for the Court to adjudicate[49]:

a) NOAC has traditionally allowed any member of the general public to be interred in Nos. 1 and 2 for a fee or sometimes for free;

b) the general public enjoyed free and reasonable access and use of Nos. 1 and 2 since these cemeteries were established centuries ago, as the main cemeteries of the City of New Orleans, up until NOAC began charging for entry from 2015 to 2020 and now again in 2022;

c) NOAC informed ACTGC members on June 11, 2020, that NOAC intended to reopen

---

[48] In ruling on a motion to dismiss for lack of subject-matter jurisdiction, courts look at whether the motion is either a facial attack or a factual attack. Davis v. Anthony, Inc., 886 F.3d 674, 679 (8th Cir.2018); Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir.2014); see Global Tech. v. Yubei (Xinxiang) Power Steering Sys. Co., 807 F.3d 806, 810 (6th Cir.2015). If a Fed. R. Civ. P. 12(b)(1) motion challenges the sufficiency of the allegations of jurisdiction—i.e., the complaint does not allege sufficient facts on which subject-matter jurisdiction can be based—it is a facial attack, and the court can dismiss for lack of subject-matter jurisdiction based on the complaint alone. Constitution Party of Pa., 757 F.3d at 358; see Wayside Ch. v. Van Buren Cty., 847 F.3d 812, 816 (6th Cir.2017); Silha v. ACT, Inc., 807 F.3d 169, 173 (7th Cir.2015); Pueblo of Jemez v. U.S., 790 F.3d 1143, 1148 n.4 (10th Cir.2015); Kerns v. U.S., 585 F.3d 187, 192 (4th Cir.2009). Defendants' have only ever raised a facial attack—i.e., asserting only that the alleged facts are insufficient without actually contesting them. In a facial attack, **the court will accept all material allegations in the complaint as true and construe them in the light most favorable to the nonmovant**. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); Constitution Party of Pa., 757 F.3d at 356 n.12; see Kerns, 585 F.3d at 192; McElmurray v. Consolidated Gov't of Augusta-Richmond Cty., 501 F.3d 1244, 1251 (11th Cir.2007). The court will not look beyond the allegations in the complaint. Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir.2015); Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443–44 (7th Cir.2009).

[49] **Only if factual disputes are involved**—e.g., genuine disputes of material fact are created by the response to the preliminary injunction—must the court conduct an evidentiary hearing before issuing a preliminary injunction. Ty, Inc. v. GMA Accessories, Inc., 132 F.3d 1167, 1171 (7th Cir.1997); see Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir.1996). **If no factual dispute is involved, an evidentiary hearing is not required, as long as the parties are given a fair opportunity to present their views on the legal issues**. See Kaepa, 76 F.3d at 628; Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir.1995); Stanley v. University of S. Cal., 13 F.3d 1313, 1326 (9th Cir.1994).

"possibly in the next week" and allow ACTGC members to provide tours at No. 1[50];

d) between June 11, 2020, and October 7, 2021, defendants reached an agreement to exclude from the Relevant Service Market within the Relevant Geographic Market all other competition by excluding them from  No. 1 and fix the price of entry at $25.00 per adult, as the manager of CTN informed an ACTGC member in person and by email on or before October 7, 2021[51];

e) during the extended COVID-19 pandemic closure, defendants planned in 2021 and now in 2022 have enacted a plan to exclude from No. 1 the nonpaying general public, including relations and friends unable to convince NOAC of their status; City of New Orleans tour guides and companies licensed to provide tours in public spaces in the city; and every other member of the general public desiring to enter and use the cemetery space in No. 1 for traditional purposes—e.g., mourn, honor, pray, meditate, learn about those interred therein and New Orleans' distinctive cemetery customs and architecture, etc.;

f) defendants planned in 2021 and now in 2022 have enacted a plan to fix the prices for the only cemetery tour allowed at No. 1 at a price of $25.00, which is higher than any other price in 2019 for a tour only of No. 1; and

g) NOAC has kept No. 2 closed to everyone but people NOAC recognized to be relations of someone interred therein;

---

[50] R. Doc. 2-1 at 4 and Ex. B.

## B. Substantial Threat of Irreparable Injury

79.     This litigation was initiated because ACTGC members were being (1) irreparably harmed by NOAC's arbitrary decision to keep Nos. 1 and 2 closed beyond any state or city mandated pandemic closure; (2) threatened with additional irreparable harm when defendants' commence their anticompetitive scheme and the expectation that NOAC would once again unlawfully exclude the nonpaying general public (with the exception of relations who could convince NOAC of their status) from Nos. 1 and 2.

80.     Eleven days after the filing of the first amended complaint, defendants enacted their anticompetitive scheme and began conducting their own tour at No. 1 while still arbitrarily keeping No. 2 closed. This ended the possibility for several ACTGC members of reopening their cemetery tour business and forced others to permanently close theirs, thereby causing more irreparable harm to ACTGC members. Please refer to the discussion of standing above in paragraphs 14-37 for a short, plain, and direct statement[52] of the irreparable harm to ACTGC members. They have obviously suffered financial harm from being excluded from the two public cemeteries in the city that receive up to 90% of the industry focus, but they have also suffered harm that cannot be obviated by monetary relief…for which no amount of potential monetary

---

[51] R. Doc. 2-1 at 4 and Ex. A.

[52] The parties should state matters in simple, direct sentences and should avoid legalese and detailed statements of the evidence. Allegations in the pleadings must be short, plain, and direct. Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); see FRCP 8(d)(1); see, e.g., Kuehl v. FDIC, 8 F.3d 905, 908 (1st Cir.1993) (court dismissed amended complaint that did not conform to FRCP 8). A complaint must (1) give the defendant fair notice of the plaintiff's claim and (2) contain sufficient factual matter that—when accepted as true—states a claim of relief that is plausible on its face. See FRCP 8(a); Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 555; Breaux v. American Family Mut. Ins., 554 F.3d 854, 862 (10th Cir.2009). For a claim to be plausible, the plaintiff must plead factual content that allows a reasonable inference that the defendant is liable for the alleged misconduct. Iqbal, 556 U.S. at 678; Twombly, 550 U.S. at 556; see Wright and Miller et al., Federal Practice and Procedure, Civil § 1216 (3d ed.). The plaintiff is not required to plead detailed factual allegations, but the allegations must be sufficient to raise a right of relief above mere

compensation will make them whole if they prevail.

81.     ACTGC has pled in a verified complaint that its members are being and will continue to be irreparably harmed by defendants' anticompetitive conduct. Defendants have not contested the relevant facts alleged opting instead to only focus on procedural and substantive law challenges.[53] Those facts establish that it would be very difficult if not impossible to quantify such losses—e.g., a person's independent business (members forced to work for someone other than themselves); the loss of housing or experiencing hunger (they and their family) because they are unlawfully and arbitrarily excluded from the two public spaces where they have made their living for years or even decades, emotional harm to relations (those unable to convince NOAC of their status) and friends and even admirers (who have studied, traveled to New Orleans, and even become licensed by the city) wrongfully excluded from Nos. 1 and 2; loss of reputation for members who have to explain to new and returning customers why they can no longer access Nos. 1 and 2 while a brand new competitor with no prior market share was given exclusive access by NOAC, a previously unknown market participant.

## C. No Harm to Defendants

82.     While the ongoing harm to ACTGC members, already discussed above, ranges from irreparable to financial, there is no cognizable harm to defendants that could result from a grant of injunctive relief. First, the general public (including relations and friends and admirers and

---

speculation. Twombly, 550 U.S. at 555; see Iqbal, 556 U.S. at 678 (allegations must be more than "the defendant unlawfully harmed me").

[53] "A party sufficiently proves that monetary damages are not adequate when it brings forward evidence, in the form of affidavits, declarations, **or any other support**, that shows imminent harm that is difficult to quantify." (emphasis added). ADT, LLC v. Capital Connect, Inc., 145 F. Supp. 3d 671, 697 (N.D. Tex. 2015). Even exceptional economic harm may constitute irreparable injury where the existence of the business will likely cease. Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A., 875 F.2d 1174, 1179 (5th Cir. 1989).

researchers, etc.) possesses a real right to access and use public cemeteries, all of which are located on land irrevocably dedicated to the general public for use as a cemetery so that the general public may visit them for various traditional purposes.[54] Therefore, NOAC does not possess a real right to control—or to license to CTN—access and use of its public cemeteries beyond reasonable conduct traditionally recognized as relating to NOAC's cemetery business, which does not traditionally include tourism business. Also, NOAC has so far failed to demonstrate any legal basis for its attempts to conduct tourism business at its public cemeteries, in violation of state legislation and custom.[55] Furthermore, because of their informed appreciation of and reliance for their livelihood on historical cemeteries, ACTGC members have already informed NOAC that they can and will coordinate tours of NOAC cemeteries (in compliance with NOAC's traditional cemetery authority decisions) for free and also collect a reasonable amount from each of their customers purchasing tours at NOAC cemeteries and make that money—certainly more than defendants can obtain through their anticompetitive scheme— available to NOAC specifically for the protection and preservation and improvement of NOAC cemeteries, thereby legally accomplishing what NOAC cannot legally do for itself. Finally, CTN was organized on June 22, 2021 (376 days after NOAC wrote ACTGC members that it hoped to reopen No. 1 "in the next week"), specifically to participate in defendants' anticompetitive scheme. This means that CTN was created after defendants began to develop their anticompetitive scheme. Nevertheless, a grant of the injunctive relief requested would allow CTN to compete on an equal footing offering tours in the Relevant Service Market within the Relevant Geographic Market.

D. Relief Protects Real Right of the General Public

---

[54] La. R.S. §8:305.

83.     As already mentioned above, ACTGC seeks to protect the real right of the general public (of which ACTGC members are a part with specific interests relating to Nos. 1 and 2 adversely affected by defendants' conduct) to free and reasonable access to all public cemeteries in the state; that right is threatened by defendants' conduct and their legal arguments, which wholly ignore established Louisiana primary law—i.e., custom and legislation—none of which supports NOAC's assertion that it possesses real rights that have been recognized for centuries as being possessed by the general public. The requested relief would ensure that all parties follow the law as it has been understood for over two centuries. In these proceedings, ACTGC has cited ample legal authority—i.e., custom, legislation, and jurisprudence—demonstrating the general public's right to free and reasonable access to public cemeteries. Other than make the blatantly false assertion that NOAC holds unencumbered full title to the immovable on which a public cemetery is located, NOAC has never made a serious attempt to provide legal authority for its assertion that it can charge for entry into and place unreasonable restrictions on use of a public cemetery, neither of which have ever been allowed before in Louisiana…or apparently anywhere else in the United States.

84.     All conditions precedent have occurred or have been performed prior to the bringing of this action, in compliance with Fed. R. Civ. P. 9(c).

WHEREFORE, PLAINTIFF PRAYS FOR RELIEF AS FOLLOWS:

1. That the Court adjudge and decree as follows:

---

[55] La. R.S. §8:306(B).

a. That Defendants' conduct in contracting and combining together in 2021 in restraint of trade or commerce by requiring payment to enter a free public cemetery and fixing those prices paid by tour customers at Nos. 1 and 2, after excluding all New Orleans licensed cemetery tour competition, violates Sections 1 of the Sherman Act, 15 U.S.C. § 1;

b. That Defendants' conduct in combining together in 2021 to create a monopoly and maintaining that monopoly to the present day by excluding all New Orleans licensed cemetery tour competition from Nos. 1 and 2 violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

c. That Defendants' conduct in contracting and combining together in 2021 in restraint of trade or commerce by requiring payment to enter a free public cemetery and fixing those prices paid by tour customers at Nos. 1 and 2, after excluding all New Orleans licensed cemetery tour competition, violates La. R.S. §51:122;

d. That Defendants' conduct in combining together in 2021 to create a monopoly and maintaining that monopoly to the present day by excluding all New Orleans licensed cemetery tour competition from Nos. 1 and 2 violates La. R.S. §51:123;

e. NOAC has exceeded its authority as a cemetery authority and violated the real rights of the general public to visit and use public cemeteries, pursuant to Revised Statute Title 8 and Louisiana primary law of custom stretching back over two centuries, by the following conduct:

i. placing unreasonable access and use restrictions on relations of those interred in Nos. 1 and 2;

    ii.   excluding the general public entirely from No. 2, except those able to convince NOAC of their relation to someone interred in No. 2;

    iii.  excluding the nonpaying general public from No. 1, including friends and admirers of those interred therein as well as tour guides and companies licensed by the City of New Orleans to conduct tours in public spaces in the city;

    iv.  requiring payment, to enter the public cemetery No. 1, from anyone unable to convince NOAC that they are a relation of someone interred in Nos. 1; and

    v.  placing unreasonable use and access restrictions for No. 1 on the general public, including relations, friends, and admirers of those interred. as well as tour guides and companies licensed by the City of New Orleans to conduct tours in public spaces in the city.

2. That NOAC, all persons acting on its behalf or under its direction or control, and all successors thereto, be preliminarily and permanently enjoined from:

    a.  placing entry and use restrictions on any of NOAC's public cemeteries, other than traditional opening days and times and reasonable, considered rules of etiquette;

    b.  requiring payment from natural persons to enter or use any of NOAC's cemeteries for traditional cemetery purposes not prohibited by reasonable, considered rules of etiquette; and

    c.  excluding New Orleans licensed tour guides and companies from any of NOAC's cemeteries, as long as they comply with reasonable, considered rules of etiquette; and

    d.   <u>conducting tourism business at any of NOAC's cemeteries.</u>

3. That the Court preliminarily and permanently enjoin defendants and their owners, members, officers, agents, affiliates, subsidiaries, servants, employees, contractors, and all other persons or entities in active concert or privity or participation with them, from taking retaliatory action against ACTGC or its members or their owners, members, officers, agents, affiliates, subsidiaries, servants, employees, and contractors for bringing this lawsuit

4. That the Court enter such other preliminary and permanent relief as is necessary and appropriate to restore competitive conditions in the market affected by defendants' unlawful conduct.

5. That the Court retain jurisdiction of this matter to enforce the terms of the Court's orders.

6. <u>That the Court enter such additional relief as it may find just and proper.</u>

7. <u>That the plaintiff recover its attorneys' fees and the costs of this action.</u>

Dated: February 11, 2022                DAVID W. NANCE LAW FIRM LLC


                                     /s/ David W. Nance
                          By: _____

                          David W. Nance (La. Bar #25467)
                          DAVID W. NANCE LAW FIRM, LLC
                          3912 Constance Street
                          New Orleans, Louisiana 70115
                          (504) 450-3938 direct
                          (504) 355-1669 fax
                          david@dwnlaw.com

                          COUNSEL FOR PLAINTIFF

**VERIFICATION**[56]

STATE OF LOUISIANA

PARISH OF ORLEANS

Before me, the undersigned authority, personally came and appeared: **Jordan Hobson**

who, having been duly sworn, deposed and stated to me, Notary, that Jordan Hobson is the

interim manager of plaintiff, Association of Cemetery Tour Guides and Companies L3C d.b.a.

New Orleans Association of Cemetery Tour Guides and Companies, plaintiff in the above-styled

proceedings, and all the allegations of facts and circumstances contained in this second amended

and supplemental complaint are true and correct to the best of plaintiff's knowledge, information

and belief.

ASSOCIATION OF CEMETERY TOUR GUIDES AND COMPANIES L3

BY: _____

JORDAN HOBSON
Interim Manager

SWORN TO AND SUBSCRIBED BEFORE ME THIS 11TH DAY OF FEBRUARY 2022.

_____
NOTARY PUBLIC

DAVID W. NANCE
NOTARY PUBLIC
LA. BAR ROLL #25467
NOTARY NO. 82639
STATE OF LOUISIANA
My Commission is for Life

_____

[56] The application for a preliminary injunction must be accompanied by an affidavit or a verified complaint. See
Bascom Food Prods. v. Reese Finer Foods, Inc., 715 F.Supp. 616, 624 n.14 (D.N.J.1989). The application is
usually supported by affidavits, but it can be supported by other evidence. See Federal S&L Ins. v. Dixon, 835
F.2d 554, 558 (5th Cir.1987); Ross-Whitney Corp. v. Smith Kline & French Labs., 207 F.2d 190, 198 (9th
Cir.1953); Wright and Miller et al., Federal Practice and Procedure, Civil § 2949 (3d ed.) (footnotes 13–14).
Because preliminary injunctions are governed by less strict evidentiary rules, the evidence can be based on
information and belief, hearsay, and personal knowledge. See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,
51 F.3d 982, 985 (11th Cir.1995); Federal S&L Ins. v. Dixon, 835 F.2d at 558; Asseo v. Pan Am. Grain Co.,
805 F.2d 23, 26 (1st Cir.1986).

CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system and mailed by United States Postal Service on any nonparticipating parties or their counsel of record.


/s/ David W. Nance

By: _____

David W. Nance (La. Bar #25467)

COUNSEL FOR PLAINTIFF