UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WITCHES BREW TOURS LLC                              CIVIL ACTION

VERSUS                                              NO. 21-2051

NEW ORLEANS ARCHDIOCESAN                            SECTION M (5)
CEMETERIES, d.b.a., NEW
ORLEANS CATHOLIC CEMETERIES

## ORDER & REASONS

Before the Court are two motions to dismiss under Rule 12(b)(6) of the Federal Rules of

Civil Procedure, one filed by Cemetery Tours NOLA, LLC ("CTN"),[1] the other filed by New

Orleans Archdiocesan Cemeteries d/b/a New Orleans Catholic Cemeteries ("NOAC")[2] (together,

"Defendants").  Plaintiff New Orleans Association of Cemetery Tour Guides and Companies ("the

Association") responds in opposition.[3]  CTN replies,[4] which NOAC adopts as its own.[5]  Having

considered the parties' memoranda, the record, and the applicable law, the Court issues this Order

& Reasons granting the motions, dismissing the Association's antitrust claims, and declining to

exercise supplemental jurisdiction over its state-law claims.

## I.        BACKGROUND

This case concerns two of New Orleans' storied cemeteries: St. Louis Cemetery Nos. 1 and

2 (together, "Nos. 1 and 2"), both owned and operated by NOAC.[6]  Situated near the French

Quarter, these final resting places of "the famous and forgotten" allegedly attract hundreds of

---

[1] R. Doc. 53.
[2] R. Doc. 54.
[3] R. Doc. 58.
[4] R. Doc. 63.
[5] R. Doc. 64.
[6] R. Doc. 16-2 at 2-3, 13.

thousands of visitors each year.[7]  The general public enjoyed a free right of access to the cemeteries until 2015, when NOAC closed No. 1 to all but families owning there and visitors willing to pay a fee upon entry.[8]  NOAC continued to charge its visitors until 2020, when it closed both Nos. 1 and 2 to all but the immediate family members of the interred as a result of the COVID-19 pandemic.[9]

At some point and through some process unknown to this Court, NOAC awarded a contract to CTN to "manage tours in St. Louis Cemetery [No.] 1."[10]  Afterwards, the manager of CTN emailed at least one of the Association's members[11] indicating that CTN would commence tours under new terms dictated by NOAC, including: (1) all tour narratives and routes must be approved by NOAC; (2) only tour guides from CTN are allowed to conduct tours; (3) local company tour guides may escort tour groups, but may not offer commentary; and (4) prices will be fixed at $25.00 per customer for adults and $18.00 for tour wholesalers.[12]  The new adult price is $5.00 more than the price charged before Defendants commenced their venture.[13]  On or about November 26, 2021, NOAC reopened No. 1, but only to family members and those touring with CTN, which, according to the Association, excludes "the nonpaying general public, including relations and friends unable to convince NOAC of their [familial] status; City of New Orleans tour guides and companies licensed to provide tours in public spaces in the city; and every other member of the general public desiring to enter and use the cemetery space in No. 1 for traditional purposes."[14] No. 2 remains closed.[15]

---

[7] R. Docs. 10 at 2, 9;16-2 at 13; 42 at 3.
[8] R. Docs. 16-2 at 12, 14; 42 at 17.
[9] R. Docs. 10 at 9; 16-2 at 21; 42 at 27.
[10] R. Doc. 16-3 at 1.
[11] R. Doc. 42 at 16.
[12] R. Doc. 16-3 at 1-2.
[13] R. Doc. 42 at 16.
[14] *Id.* at 21, 28.
[15] *Id.* at 21.

The Association, comprised of New Orleans cemetery tour guides and companies, contends that its 76 members are excluded from visiting and providing their services in Nos. 1 and 2 because of Defendants' recently-adopted plan.[16]  It laments that "[c]ustomers are not willing to pay for two tours – *i.e.*, pay for one of [the Association']s members to escort them to No. 1, only to pay defendants for their cemetery tour to gain entry."[17]  And so, as a result of Defendants' joint venture, the Association argues that its members have been "irreparably harmed" in that they (1) lost a large percentage of their business revenue or their independent business altogether; (2) are now homeless and are "experiencing hunger"; (3) suffered emotional harm; (4) lost their reputation among their new and returning customers; and (5) are forced "to learn a new profession or find a job for which they lack preparation, training, and experience."[18]  The Association "only seek[s] relief from the Court to stop the ongoing harm"[19] "by enforcing Louisiana primary and secondary law establishing and confirming the right of [the Association's] members, as interested members of the general public, to have free and reasonable access to public cemeteries, including Nos. 1 and 2."[20]

This action was originally filed by now-terminated plaintiff Witches Brew Tours LLC ("WBT"),[21] which moved for a temporary restraining order ("TRO") and a preliminary injunction enjoining the implementation of Defendants' plan.[22]  The Court denied WBT's motion for a TRO for failure to demonstrate a substantial threat of irreparable injury.[23]   After that denial, the

---

[16] *Id.* at 9-10.
[17] *Id.* at 25.
[18] *Id.* at 12, 16, 30.
[19] *Id.* at 9.
[20] *Id.* at 13.
[21] R. Doc. 1.
[22] R. Doc. 2.
[23] R. Doc. 5 at 3.  The Court also denied WBT's motion for preliminary injunction as moot because WBT was no longer a party to the action.  R. Doc. 41 at 14 n.62.

3

Association, which was created only after WBT filed the action,[24] replaced WBT as the sole plaintiff in this case.[25]   The Association then moved for a preliminary injunction,[26] which, following a hearing, the Court denied for failure to establish irreparable harm.[27]  The Association appealed the denial of its motion for preliminary injunction.[28]   That appeal remains pending. Defendants then moved to dismiss the action for lack of jurisdiction,[29] which the Court granted but with leave for the Association to file a second amended complaint to cure its pleading deficiencies.[30]

In its second amended complaint, the Association asserts five theories of liability against Defendants: (1) unlawful price fixing, in violation of 15 U.S.C. § 1;[31] (2) unfair and unreasonable monopolization, in violation of 15 U.S.C. § 2;[32] (3) unlawful price fixing, in violation of La. R.S. 51:122;[33] (4) unfair and unreasonable monopolization, in violation of La. R.S. 51:123;[34] and (5) a cause of action titled "Action to Enforce Real Right, Alternatively Possessory Action, Regarding Unlawful Restrictions on Relations and Exclusion of Friends and the General Public from Public Cemeteries, in violation Louisiana Civil Code articles 3654-3663."[35]  The complaint also alleges that the Association "satisf[ies] the procedural and substantive requirements for injunctive relief" and that the Association requests NOAC to be preliminarily and permanently enjoined from its allegedly wrongful actions.[36]  The Association, however, has not yet moved for injunctive relief

---

[24] R. Doc. 17-1 at 3.
[25] R. Doc. 10.
[26] R. Doc. 16.
[27] R. Doc. 41 at 14.
[28] R. Doc. 45.
[29] R. Doc. 17.
[30] R. Doc. 41 at 14.
[31] R. Doc. 42 at 16.
[32] *Id.* at 18.
[33] *Id.* at 19.
[34] *Id.* at 20.
[35] *Id.* at 21.
[36] *Id.* at 26, 34-35.

pursuant to the second amended complaint, presumably awaiting the result of its appeal of the order denying its first motion for preliminary injunctive relief.

## II.   PENDING MOTIONS

In their motions, Defendants argue that the Association has not made the factual allegations necessary to sustain its claims.[37]  The Association's antitrust claims fail as a matter of law, say Defendants, because it has not sufficiently pleaded the relevant product or geographic market[38] and, even if it had, the agreement between NOAC and CTN is not an unreasonable restraint of trade.[39]  The Association's possessory action fails, too, continue Defendants, because Nos. 1 and 2 are not public property[40] and none of its members has had uninterrupted possession of Nos. 1 and 2 for over a year.[41]  Finally, Defendants contend that to the extent the Association requests a preliminary injunction, the claim must fail because it has not established that it has or will suffer irreparable harm or that its alleged injuries cannot be cured by a money judgment.[42]

In opposition, the Association contends that "[i]t has established a *prima facie* case for each claim built on verified material facts and relevant law."[43]  It argues that it appropriately and "broadly defined the relevant product market as the entire cemetery tour industry and the relevant geographic market as the entire City of New Orleans," despite the fact that it acknowledges that the relevant market "could reasonably be argued to be tours at No. 1 because everyone visiting No. 1 is forced to be the Defendants' customer."[44]  The Association then argues that Defendants' plan

---

[37] R. Docs. 53; 54.
[38] R. Docs. 53-1 at 5, 9; 54-1 at 5, 9.
[39] R. Docs. 53-1 at 12; 54-1 at 12.
[40] R. Docs. 53-1 at 16-17; 54-1 at 16-17.
[41] R. Docs. 53-1 at 22; 54-1 at 22.
[42] R. Docs. 53-1 at 23-24; 54-1 at 23-24.
[43] R. Doc. 58 at 1.
[44] *Id.* at 7.  Indeed, the Association ultimately concedes that its position is that the appropriate product market consists of tours of No.1 and the appropriate geographic market is No. 1 itself.  *Id.* at 11-13.

is an unreasonable restraint of trade, which will be uncovered through discovery.[45]  The possessory action has legs, too, it says, because (1) Nos. 1 and 2 are dedicated to the general public for exclusive use as cemeteries;[46] and (2) "[t]he public has literally always possessed this real right to free and reasonable access to public cemeteries," which confers standing on the Association.[47] Finally, although the Association does not clarify whether it is seeking a preliminary injunction, it argues that its members suffered irreparable harm because they have lost their business and, in some instances, had "their rights to visit the graves of relations and friends in Nos. 1 or 2" denied.[48]

In reply, Defendants argue that dismissal is warranted "because (1) [the Association]'s defined markets are insufficient to support antitrust claims and the alleged conduct is not an unreasonable restraint on trade as a matter of law; and (2) [the Association] lacks authority to declare St. Louis Cemetery No. 1 and 2 public cemeteries."[49]  Defendants contend that because the Association narrowly confines the relevant product and geographic markets to a single tour at a single site, the alleged market does not correspond to the commercial realities of the industry and, therefore, is insufficient to support an antitrust claim.[50]  Further, Defendants argue that agreements to provide exclusive services, as here, are not an unreasonable restraint on trade and that there are no facts alleged showing the agreement caused an anticompetitive effect in a relevant market.[51]  Additionally, Defendants reiterate that the Association's possessory action must fail because Nos. 1 and 2 are not public property[52] and "[n]either [the Association] nor any of its

---

[45] *Id.* at 14.
[46] *Id.* at 18.
[47] *Id.* at 21.
[48] *Id.* at 24.
[49] R. Doc. 63 at 1.
[50] *Id.* at 2-3.
[51] *Id.* at 6.
[52] *Id.*

unnamed members have possessed any of NOAC's cemeteries as an owner of the cemetery and acknowledge NOAC is the owner of St. Louis Cemetery No. 1 and/or No. 2."[53]

## III.    LAW & ANALYSIS

### A. Rule 12(b)(6) Standard

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).    Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The statement of the claim must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A pleading does not comply with Rule 8 if it offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertions' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (alteration omitted).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has acted

---

[53] *Id.* at 10.

unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Thus, if the facts pleaded in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*. The court "can choose to begin by identifying pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "[The] task, then, is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012)). Motions to dismiss are disfavored and rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

A court's review of a Rule 12(b)(6) motion to dismiss "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)). A court may also take judicial notice of certain

matters, including public records and government websites. *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005). Thus, in weighing a Rule 12(b)(6) motion, district courts primarily look to the allegations found in the complaint, but courts may also consider "documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

## B. Federal Antitrust Claims

The Association claims that Defendants engaged in unlawful price fixing and monopolization in violation of §§ 1 and 2 of the Sherman Act. Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.[54] To state a claim under § 1, a plaintiff must show that defendants: "(1) engaged in

---

[54] Section 1 only outlaws "unreasonable" restraints. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018). The Supreme Court explained:

> Restraints can be unreasonable in one of two ways. A small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output. Typically only "horizontal" restraints – restraints imposed by agreement between competitors – qualify as unreasonable *per se*. Restraints that are not unreasonable *per se* are judged under the "rule of reason." The rule of reason requires courts to conduct a fact-specific assessment of "market power and market structure ... to assess the restraint's actual effect" on competition.

*Id.* at 2283-84 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)) (other quotation, alteration, and internal citations omitted). To determine whether a restraint violates the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* at 2284.

Here, while the Association alleges that price-fixing schemes are *per se* violations of § 1, R. Doc. 42 at 16, it cannot avoid the market analysis required by the rule of reason. First, the only agreement the Association places at issue is one between CTN and NOAC, who are not competitors. Thus, because no horizontal restraint is alleged, the agreement cannot qualify as unreasonable *per se*, as the Supreme Court noted in *Ohio*. Second, "'[t]he *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason.'" *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 374 (5th Cir. 2014) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007)) (alteration omitted). "Moreover, the *per se* rule should only be applied when 'conduct is so pernicious and devoid of redeeming virtue that it is condemned without inquiry into

9

a conspiracy (2) that produced some anticompetitive effect (3) in the relevant market." *721 Bourbon, Inc. v. Willie's Chicken Shack, LLC*, 2020 WL 587886, at *2 (E.D. La. Feb. 6, 2020) (citing *Veritext Corp. v. Bonin*, 417 F. Supp. 3d, 778, 784 (E.D. La. 2019)).   Section 2 of the Sherman Act makes it unlawful for an entity to "monopolize" or attempt to monopolize. 15 U.S.C. § 2.   To state a claim under § 2, a plaintiff must show that the defendant: "'1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident.'"   *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015) (quoting *Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 522 (5th Cir. 1999)).

A "prerequisite" to Sherman Act claims under either § 1 or § 2 is the plaintiff's definition of the relevant market.   *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453-54 (5th Cir. 2021) (collecting cases), *aff'g* 2020 WL 1854969, at *5 (W.D. Tex. Apr. 9, 2020) ("A 'relevant market' is an essential element to a Sherman Act claim: it is the pool a court must assess to determine the ripple effect of any purported antitrust conduct on competition.").   "'Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition.'"   *Id.* at 454 (quoting *Ohio*, 138 S. Ct. at 2285).   "The relevant market is 'the area of effective competition' 'in which the seller operates, and to which the purchaser can practicably turn for supplies.'"   *Id.* (quoting *Ohio*, 138 S. Ct. at 2274, and *Tampa Elec. Co. v. Nashville Coal*

---

the effect on the market in the particular case at hand.'"   *Id.* (quoting *Spectators' Commc'n Network Inc. v. Colonial Country Club,* 253 F.3d 215, 223 (5th Cir. 2001)) (alteration omitted).   Based on what has been presented to the Court, it cannot now apply the *per se* rule.   Accordingly, the Court looks to the rule of reason, which requires a definition of the relevant market.   *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002).   Regardless, the Association does not argue that an analysis of the relevant market should not be conducted.

*Co.*, 365 U.S. 320, 327 (1961)) (footnotes omitted).  It has two components: a product market and a geographic market.  *Id.* (citing *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010)).

"'Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted.'" *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417-18 (5th Cir. 2010) (quoting *Apani*, 300 F.3d at 628).  "'Nevertheless, dismissal of an antitrust claim at the motion to dismiss stage for failure to plead the relevant market adequately should not be done lightly because market definition is a fact-intensive inquiry.'" *Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*, 2020 WL 4050243, at *9 (E.D. La. July 17, 2020) (quoting *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 378 (E.D. La. 2013)).  The Association's failure to plead a legally sufficient definition of either the product market or the geographic market warrants dismissal of its antitrust claims.[55]

### 1.  The product market

In its second amended complaint, the Association defines the relevant product market as "the cemetery tour industry ... which is focused almost exclusively on Nos. 1 and 2."[56]  It then explains that it "has broadly defined the relevant product market as the entire cemetery tour industry ... when it could reasonably be argued to be tours at No. 1 because everyone visiting No. 1 is forced to be the Defendants' customer."[57]  The Defendants contend that "the product market

---

[55] Moreover, due to the blatant inconsistency in pleading regarding the product and geographic markets, the Association does not allege with reasonable definiteness facts from which this Court may infer conduct plausible to support a claim for an antitrust violation.
[56] R. Doc. 42 at 2.
[57] R. Doc. 58 at 7.

cannot be confined to cemetery tours,"[58] and that even this broader definition "should be disregarded because it is inconsistent with [the Association's] other allegations suggesting that St. Louis Cemetery Nos. 1 and 2 are actually the product market."[59]   Moreover, that the Association offers combined tours of the French Quarter and Voodoo sites "make[s] clear that the relevant product market is not cemeteries – but rather historical and cultural sites," argue Defendants.[60] And so, Defendants contend that "it cannot reasonably be said that tours of No. 1 are not interchangeable with tours of other historically and culturally significant sites in New Orleans, including other cemeteries in New Orleans."[61]   The Court agrees.

A legally insufficient definition of the relevant product market is one "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Apani*, 300 F.3d at 628 (collecting cases).   "'Interchangeability implies that one product is roughly equivalent to another for the use to which it is put.'  Cross-elasticity of demand measures the substitutability of those products from viewpoint of the buyers." *Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*, 2010 WL 3488244, at *19 (E.D. La. Aug. 26, 2010) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997)).  So, for the Association's definition of the relevant product market to be legally sufficient, "it 'must include all "commodities reasonably interchangeable by consumers for the same purposes."'"  *Shah*, 985 F.3d at 454 (quoting *PSKS*, 615 F.3d at 417); *see also Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) (observing that a

---

[58] R. Doc. 54-1 at 7.
[59] *Id.* at 8.
[60] *Id.* at 7.
[61] R. Doc. 63 at 4.

plaintiff must identify "where consumers could turn for alternative products or sources of the product if a competitor raises prices"). Failure to properly define the product market warrants dismissal. *See Vaughn*, 2010 WL 3488244, at *20.

Not only does the Association fail to define the relevant product market with reference to reasonable interchangeability and cross-elasticity of demand, but it also fails to cite any legal authority to support that these elements need not be addressed. The second amended complaint is entirely devoid of allegations that concern the extent to which the Defendants' tour is interchangeable in use, or the degree of cross-elasticity of demand, with other products. First, assuming that the proposed product market is "cemetery tours," the Association identifies no commodity with which cemetery tours are reasonably interchangeable. *Contra Acad. of Allergy & Asthma*, 2020 WL 4050243, at *9 (holding that plaintiff sufficiently defined the relevant product market as "allergy testing and allergen immunotherapy" where plaintiff identified board-certified allergists or allergy blood testing at a reference laboratory as alternatives). Yet, as Defendants argue, the product market is not reasonably confined to cemetery tours but extends to other kinds of tours and, when viewed from this more complete perspective, there are other reasonably interchangeable product alternatives, including architecture tours, French Quarter and Voodoo tours, and tours of cultural attractions such as Jackson Square, the Garden District, and Louis Armstrong Park.[62] Ghost tours and historical tours may also be reasonably interchangeable. And even this does not begin to round out the list of interchangeable alternatives.

Second, assuming that the product market is limited to the "cemetery tour" of No. 1, as the Association ultimately concedes, the Association fails to identify a single commodity with which a tour of No. 1 is reasonably interchangeable. But, as Defendants observe, there are other

---

[62] *See* R. Doc. 54-1 at 7.

reasonably interchangeable alternatives, including tours of New Orleans cemeteries such as Lafayette Cemetery, Metairie Cemetery, Holt Cemetery, and St. Roch Cemetery.[63]   Absent a showing of where people could practicably go for alternative cemetery tours, the Association fails to define a legally sufficient product market.  *See Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1*, 309 F.3d 836, 840 (5th Cir. 2002) (concluding that proposed relevant market was improper where there was no attempt to identify (1) competing hospitals or clinics; or (2) where people could practicably go for the services at issue).  The Association's failure to even "attempt" to offer interchangeable substitutes warrants dismissal.  *See Shah*, 985 F.3d at 455 (finding that plaintiff failed to define the relevant market where the proposed product market was "pediatric anesthesiologists," when plaintiff "did not attempt to identify" other hospitals or clinics where consumers could practicably go for pediatric anesthesia services).

The Association, however, argues that "[n]othing is interchangeable with No. 1 if you only want to visit people interred in No. 1."[64]  This argument is without merit.  In *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, the Fifth Circuit concluded that a plaintiff's relevant product market could not be limited to Holiday Inn hotel rooms; but rather, the market consisted of hotel rooms more broadly.  732 F.2d 480, 488-89 (5th Cir. 1984).  The court reasoned that "absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market."  *Id.* at 488.  It concluded: "The fact that a company limits its competitive activity to a single firm's products (and at only one competitive level) cannot control the definition of the relevant market."  *Id.* (quotation and alteration omitted).  And so, the Fifth Circuit decided that "no material distinction exists between Holiday Inns, which 'produces' hotel rooms, and

---

[63] *Id.* at 8.
[64] R. Doc. 58 at 11.

manufacturers of commodities who market their products nationally under trademarked brand names." *Id.*

The same analysis applies here. The Association has not identified a single "exceptional market condition" that would warrant limiting the relevant product market to a tour of No. 1. There are no allegations that Defendants' cemetery tour is a unique product, *see id.* at 489 (collecting cases), or that the cemetery tour industry is appropriately confined to No. 1. *See Acad. of Allergy & Asthma*, 2020 WL 4050243, at *9 (observing that "dismissal is appropriate where a plaintiff 'attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes' or 'fails even to attempt a plausible explanation as to why a market should be limited in a particular way'") (quoting *In re Pool Prods.*, 940 F. Supp. 2d at 378) (alteration omitted). As a result, the Association's argument that "there are no public cemeteries that can be substituted for what Nos. 1 and 2 offer in history, proximity to the French Quarter, the specific individuals interred therein, etc.," without more, is unavailing.[65] Moreover, the rule of reasonable interchangeability and cross-elasticity of demand would be swallowed if the Association's ever-narrowing definition of the relevant product market – to include only tours of public cemeteries two centuries old situated next door to the French Quarter and in which Marie Laveau is buried – were accepted.

The Association, then, has insufficiently defined the relevant product market. It fails to propose any interchangeable substitute product or identify an exceptional market condition that might support its contention that there is no plausible substitute. *See Shah*, 985 F.3d at 455. The second amended complaint does not plausibly allege that Defendants, by restricting tours of No. 1 to themselves, have unreasonably restrained trade in, dominated, or monopolized a market that

---

[65] R. Doc. 42 at 3.

includes tours of other storied, popular attractions, historical and cultural sites, and even other cemeteries. *See Doctor's Hosp. of Jefferson, Inc.*, 123 F.3d at 312. Drawing all factual inferences in the Association's favor, its product market definition is insufficient as a matter of law.

### 2. The geographic market

The Association's definition of the geographic market fails, too. Although the Association states that New Orleans is the proper geographic market,[66] it effectively concedes its position to be that No. 1, by itself, is the more appropriate geographic market.[67] Defendants argue the Association's narrowing of the geographic market is inappropriate when it (1) discounted other cemetery sites from the broader geographic market; (2) fails to identify its share of the market;[68] and (3) "does not allege facts to show an appreciable portion of the tours of historically and culturally significant sites in New Orleans and South Louisiana were affected by the agreement pertaining to tours of No. 1."[69] Because the Association defines its geographic market so narrowly, it has not stated a plausible claim under either § 1 or § 2.

"In defining the relevant geographic market, [the Fifth Circuit] looks at 'the area of effective competition[,]'" that is to say, "the area 'in which the seller operates and to which buyers can practicably turn for supplies.'" *Wampler*, 597 F.3d at 744 (first quoting *Tampa Elec. Co.*, 365 U.S. at 328, and then *Apani*, 300 F.3d at 626). Further, the proposed geographic market must "'correspond to the commercial realities of the industry and be economically significant.'" *Id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336-37 (1962)). Commercial realities include "'size, cumbersomeness, and other characteristics of the relevant product' along with 'regulatory constraints impeding the free flow of competing goods into an area, such as

---

[66] *Id.* at 2.
[67] R. Doc. 58 at 11-12.
[68] R. Doc. 54-1 at 11.
[69] R. Doc. 63 at 3.

perishability of products, and transportation barriers.'" *Id.* at 744-45 (quoting *Apani*, 300 F.3d at 626) (alteration omitted). "[I]n order for an area to qualify as being economically significant, it must contain an 'appreciable segment of the product market.'" *Apani*, 300 F.3d at 627 (quoting EARL W. KINTNER, FEDERAL ANTITRUST LAW: VOLUME IV THE CLAYTON ACT SECTION 3; SECTION 7; MERGERS AND MARKETS § 38.2 (1984) ("KINTNER")). "'Whether a segment is appreciable depends upon whether it includes either an appreciable proportion of the product market as a whole, or a proportion of the product market which is largely segregated from, independent of, or not affected by competition elsewhere.'" *Id.* (quoting KINTNER) (internal quotation marks omitted). The Association's proposed geographic market neither corresponds to the commercial realities nor is economically significant.

In its second amended complaint, the Association alleges facts that wholly contradict its statement that the geographic market is the broader New Orleans metropolitan area. That's because all of the Association's allegations of anticompetitive activities are made solely in reference to its inability to tour in Nos. 1 and 2 – and nowhere else in the New Orleans area. Moreover, in its opposition, the Association concedes multiple times that No. 1 is "arguably the proper geographic market" as opposed to New Orleans.[70] The Association adds, though, that when Defendants begin to conduct tours of No. 2, "then Nos. 1 and 2 would be the relevant geographic market."[71] But No. 1 is simply too narrow of an economic market to comport with the commercial realities of the touring industry or to be economically significant where tours (and even more narrowly, cemetery tours) are conducted throughout New Orleans.

For example, in *Apani*, the plaintiff, a manufacturer of bottled water, attempted to define the relevant geographic market as 27 city-owned facilities to which the city granted the defendant

---

[70] R. Doc. 58 at 11-12.
[71] *Id.* at 13.

exclusive access to supply nonalcoholic beverages.  *Apani*, 300 F.3d at 623.  The Fifth Circuit determined that this geographic market was insufficient as a matter of law because it did not comport with the commercial realities of the bottled-water industry.  *Id.* at 633.  Said the court: "Apani has simply attempted to artificially narrow a broader economic market, the City of Lubbock, to specific venues," and "[s]uch pleading maneuvers may not be used for the purpose of creating a fictitious market."  *Id.*  The court in *Apani* agreed with the district court's conclusion that the proposed market definition did not comport with the commercial realities of the industry where the plaintiff had done business in and throughout the city, which evidenced that its product, bottled water, was not limited by its size, cumbersomeness, or perishability to only the 27 city-owned facilities.  *Id.* at 628-29.  The Fifth Circuit subscribed to the district court's reasoning that the restraint on the alleged geographic market was not economically significant where (1) "'no unique limitation on competition would suggest that competition for the City of Lubbock bottled water business is separate from competition for bottled water business elsewhere in the Lubbock, Texas bottled water market,'" and, therefore, that the business conducted at the 27 city-owned facilities was economically segregated or insulated from the sale of bottled water elsewhere in the city; and (2) the plaintiff failed to allege that an appreciable proportion of the sales of bottled water in the Lubbock area was affected by the agreement.  *Id.* (alteration omitted).

The Fifth Circuit applied this same reasoning in *Wampler*.  There, plaintiff-residents of various multiple-dwelling units ("MDUs") attempted to define the relevant geographic market as a single MDU.  *Wampler*, 597 F.3d at 743.  Relying on *Apani*, the court held that a single MDU is not so segregated or isolated as to be economically significant, such that it represented a plausible geographic market.  *Id.* at 746.  The Fifth Circuit affirmed the district court's determination that the alleged geographic market of MDUs "essentially identifies specific venues (collections of

18

apartment homes) that simply narrow the broader economic market" in which the units were located, which included the entire city of San Antonio. *Id.* at 745. "[G]iven the competition that exists between MDU owners, the competition that exists between service providers, and given the highly mobile nature of today's society," the Fifth Circuit held that there were "too many competitive forces" for a single MDU unit to constitute a plausible geographic market by itself. *Id.* at 745-46.

Against this backdrop, the Association's relevant geographic market definition is insufficient as a matter of law. Like the 27 city-owned facilities in *Apani* and the single MDU in *Wampler*, the Association's identification of a single specific venue, No. 1, is simply too narrow. This Court cannot hold that the commercial realities of the New Orleans tour industry (even the cemetery tour industry) is limited by its size, cumbersomeness, or transportation barriers to only No. 1. As in *Apani*, where the plaintiff had done business around the city such that its product, bottled water, could not be limited to the 27 city-owned facilities, the Association's members do business in and throughout New Orleans: they conduct French Quarter and Voodoo tours outside of No. 1, among the many other tour opportunities available to them.[72] So, their business is not appropriately tethered solely to No. 1 and need not be limited in that way. In other words, there is no restriction on the commercial realities of the Association's or its members' industry that would merit restricting the geographic market to the lone cemetery that is the subject of Defendants' exclusive touring arrangement. As Defendants note, the Association's "preference to offer tours at St. Louis Cemetery No. 1" does not require, as a matter of law, excluding other cemeteries in New Orleans, like Lafayette Cemetery, Metairie Cemetery, Holt Cemetery, and St. Roch

---

[72] R. Doc. 42 at 8.

Cemetery, from the relevant geographic market.[73]  In short, the relevant geographic market cannot be restricted to No. 1.

As it must at this stage of the proceedings, the Court accepts as true the Association's allegation that "Nos. 1 and 2 receive up to 90% of the Relevant Service Market within the Relevant Geographic Market because there are no public cemeteries that can be substituted for what Nos. 1 and 2 offer in history, proximity to the French Quarter, the specific individuals interred therein, etc."[74]  But this allegation cannot overcome the Fifth Circuit's holding that a single site cannot be a sufficient geographic market.  *See Wampler*, 597 F.3d at 746.  In some ways, it merely demonstrates why this is true.  Considering the availability of other cemeteries across the New Orleans area, the numerous other tourists sites the city has to offer, and the highly mobile nature of today's society (including consumers willing to travel long distances for tours), the competitive forces in the New Orleans tour industry are too many to allow a single cemetery to constitute a sufficient geographic market.  Put differently, as with the exclusive sales contract in *Apani*, there is no unique limitation on competition that would suggest that competition for tours in No. 1 is separate from competition for cemetery (and other) tours elsewhere in New Orleans.  *See Apani*, 300 F.3d at 628-29.

In sum, to hold that the Association sufficiently pleaded a relevant market would "go against the purpose of antitrust laws and of the Sherman Act, which is meant to protect the viability of competition, not the individual competitors."  *Geddie v. Seaton*, 2006 WL 2263335, at *6 (N.D. Tex. Aug. 8, 2006) (quotation omitted).  The Association has inappropriately attempted to artificially narrow a broader economic market, tours (even cemetery tours) throughout New Orleans, to a single specific venue, No. 1.  This cannot support a plausible claim for an antitrust

---

[73] R. Doc. 54-1 at 10.
[74] R. Doc. 42 at 3.

violation.  *See Apani*, 300 F.3d at 633.  Accordingly, the Court holds that the Association has not sufficiently pleaded the relevant geographic market as a matter of law.

*      *      *      *      *

Because the Association's antitrust claims rest solely on its inability to provide just one kind of tour to just one location, it cannot plead a legally sufficient relevant market definition.  *See Vaughn*, 2010 WL 3488244, at *20 (dismissing antitrust claims due to their being founded on plaintiffs' inability to distribute a product to one location).  Thus, the Association's federal antitrust claims must be dismissed.

### C.  State-Law Claims

In this Order & Reasons, this Court has determined that all of the Association's federal claims should be dismissed.  Now the Court must decide whether to exercise supplemental jurisdiction over the Association's remaining state-law claims: (1) unlawful price fixing, in violation of La. R.S. 51:122;[75] (2) unfair and unreasonable monopolization, in violation of La. R.S. 51:123;[76] and (3) "Action to Enforce Real Right, Alternatively Possessory Action, Regarding Unlawful Restrictions on Relations and Exclusion of Friends and the General Public from Public Cemeteries, in violation Louisiana Civil Code articles 3654-3663."[77]  Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if, as here, it "has dismissed all claims over which it has original jurisdiction."  "District courts enjoy wide discretion in determining whether to retain supplemental jurisdiction over a state claim once all federal claims are dismissed."  *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993).  In making this decision, courts consider factors including "'judicial economy, convenience, fairness, and comity.'"  *Manyweather*

---

[75] *Id.* at 19.
[76] *Id.* at 20.
[77] *Id.* at 21.

*v. Woodlawn Manor, Inc.*, 40 F.4th 237, 246 (5th Cir. 2022) (quoting *Heggemeier v. Caldwell Cnty.*, 826 F.3d 861, 872 (5th Cir. 2016)).  "These interests are to be considered on a case-by-case basis, and no single factor is dispositive." *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008). "Applying these factors, [the Fifth Circuit holds] that a court generally 'should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial.'" *Manyweather*, 40 F.4th at 246 (quoting *Heggemeier*, 826 F.3d at 872).  As no discovery has taken place, the case remains at the pleading stage, and any trial is at most a distant possibility, these factors favor applying this general rule here.  Thus, the Court declines to exercise supplemental jurisdiction over the state-law claims.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that NOAC's motion to dismiss (R. Doc. 54) is GRANTED.

IT IS FURTHER ORDERED that CTN's motion to dismiss (R. Doc. 53) is GRANTED.

New Orleans, Louisiana, this 22nd day of August, 2022.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE